THE MAYOR AND CITY COUNCIL OF BALTIMORE *vs.*
THE WARREN MANUFACTURING COMPANY, and SUM-
MERFIELD BALDWIN.

*Preliminary or provisional Injunction—Riparian rights—Nui-
sance—Bill for an Injunction to restrain the Pollution of a
Stream used to supply water for the City of Baltimore—
Insufficiency of the Allegations in respect of one of the causes
of Pollution, to justify a Preliminary injunction, and Suffi-
ciency as to others—Mode of procedure in such cases—Act of
1872, ch. 157—Evidence.*

Where application is made for a preliminary or provisional injunction,
the right of the complainant to such immediate interposition of the
Court depends entirely upon the sufficiency of the facts charged in
the bill; and if the facts as stated upon the face of the bill, be not
full, and sufficiently definite and clear in support of the right
asserted, and of its violation in the manner charged, the Court
will not order the defendant to be restrained before he is heard in
his defence.

The Mayor and City Council of Baltimore, under an authority con-
ferred by statute, purchased certain lands adjacent to, and includ-
ing a portion of the bed of the Gunpowder river, and constructed
a dam across said stream, thereby forming a Lake, the water from
which was conducted into the City of Baltimore, and distributed
to various points therein, in order to supply the inhabitants with
pure water for drinking and other necessary purposes. A bill was
filed by the Mayor and City Council of Baltimore for an injunction
against the defendants to restrain them from polluting said river,
and charged, that the defendants, a body corporate, owned and
conducted a certain cotton factory·"situate near the Gunpowder
river, or one of the tributaries thereof, above the said lake and
dam, and that they discharge, or knowingly suffer and permit to
be discharged into the said stream, whence the same necessarily
flows into the said lake, refuse water from the said factory, *impreg-
nated with divers· injurious ingredients and substances,* put into the
same by the defendants at said· factory, whereby the water of the
said natural stream is rendered less pure and less fit for use by man

as drinking water." And as a distinct cause of defilement or pollution of the stream, it was charged that the defendants " have erected and do keep, maintain, and use, divers large privies and hog-pens at or near said factory, the excrement and filth whereof the defendants cause or wilfully suffer and permit to be discharged into the waters of the said Gunpowder river, above the said dam and lake, whereby the water of the stream so flowing into, and received by the said lake is greatly polluted." HELD:

1st. That assuming that the land was acquired as authorized by the statute, the complainants were riparian proprietors in the strictest sense, in respect to the property purchased and held by them on the stream in question; and entitled to all the riparian rights to which the parties under whom they claim, and from whom they purchased the land, were entitled at the time of the purchase.

2nd. That unless derogated from by grant or user ripened into prescription, they were entitled to all the rights of riparian proprietors, and among others to have the stream to flow into and through the lake in its ordinary natural purity and quantity, without any unnecessary or unreasonable diminution or pollution of the same by the proprietors above.

3rd. That if therefore the defendants, being upper riparian proprietors, and as such entitled to the ordinary use of the water, including the right to apply it in a reasonable way to the purposes of trade and manufacture, are using the water of the stream in an unreasonable manner, and have defiled the same in such manner, and to such an extent as to operate an actual invasion of the rights of the complainants, the latter are clearly entitled to redress by action at law, and, in case the nuisance be continued, to summary relief by injunction.

4th. That as the facts are presented on the face of the bill, that part of the case that relates to the refuse water discharged from the factory of the defendants, is not stated with sufficient certainty to justify an injunction on the statements of the bill alone, which does not state how such refuse waters are impregnated, by what substance or material, and to what extent; nor the distance of the factory from the lake, or the volume of water of the stream.

5th. That it would be impossible to grant the injunction in the terms of the prayer of the bill, as that would put the defendants to the peril of determining what would be a prohibited pollution of the stream.

6th. That the real question was, whether the water in the lake was really impaired in its fitness or value for the ordinary uses of life, by reason of any foreign substance imparted thereto by artificial means, and whether such pollution arose from the acts or permission of the defendants.

7th. That the burden of establishing these propositions was upon the complainants, and if they be made out by the facts to the satisfaction of the Court, the right to relief could not be defeated otherwise than by the establishment of an adverse right by grant or prescription.

8th. That if the right by grant or prescription, so to pollute the stream, be shown to exist, the only recourse which the complainants could have to avoid the cause of the pollution, would be the acquisition of the right by purchase or condemnation, as provided by statute.

9th. That inasmuch as the allegations of the bill in respect to the alleged pollution produced by the discharge of the refuse water from the factory into the stream, were not sufficiently definite, without the aid of evidence upon which to found an order for a special injunction, the Court below was right in refusing to grant an injunction as to that ground of complaint.

10th. That the complainants might obtain leave, however, to take testimony, under the provisions of the statute of 1872, ch. 157, to be used upon motion for an injunction; or they might wait the coming in of the answer of the defendants, and move upon the merits confessed therein, if merits be confessed; but otherwise an interlocutory injunction as to this part of the case should not be ordered.

11th. That with regard to the other ground of complaint, that is to say, the existence of the privies and hog-pens on the stream above the lake of the complainants, the allegations of the bill were more definite, and this source of pollution should be restrained; and even though there might be other sources of pollution, or other persons were committing the same sort of nuisance, it formed no reason why this particular cause or source of pollution should not be restrained.

APPEAL from the Circuit Court for Baltimore County, in Equity.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., STONE, GRASON, MILLER, ALVEY, ROBINSON, and RITCHIE, J.

*John P. Poe*, and *Arthur W. Machen,* for the appellants.

The right of the proprietor of the banks of the stream to the flow of the water in a pure and natural condition is incontrovertible ; and that it is proper for a Court of equity to protect that right by injunction is now equally well settled.    *Wood on Nuisances, section* 677; 1 *High on Injunction, secs.* 794, 810; *Kerr on Injunction,* 382; *Atty. Gen. vs. Birmingham,* 4 *Kay & Johnson,* 528; *Atty. Gen. vs. Leeds Corporation, L. R.,* 5 *Chan.,* 583; *Holsman vs. Boiling Spring Bleaching Co.,* 1 *McCarter, N. J.,* 335.

The right of the riparian proprietor is not limited to any previous use which the water in former times was put to.    A new mode of enjoyment gives a right at once to sue for the injury done in respect of such new use.    *Pennington vs. Brinsop Hall Coal Co., L. R.,* 5 *Ch. D.,* 773 ; *Holker vs. Porritt, L. R.,* 10 *Ex.,* 62.

It is not here a mere question of comfort or convenience, but one of *health* also.    Incalculable importance is given to the means taken for the preservation of the purity of water used for consumption in drinking and cooking, in a great number of households, by the fact that modern science has established the probability that disease may be communicated by the distribution of particles of feculent matter, in such manner as to be taken into the human system, producing fatal and wide-spreading consequences, although the germs so propagated "may be either inappreciable or scarcely appreciable by the most minute chemical analysis."    "It is impossible in that state of things to say what amount of injury may be done by polluting, even partially, a stream which flows a considerable distance."    *Goldsmid vs. Tunbridge Wells Improvement Commissioners, L. R.,* 1 *Eq.,* 170.

And while the danger from some other kinds of impurity may not be equally great, the same principle applies as to all, and prohibits the introduction into the mass of pure drinking water, of substances which, in themselves, are offensive or capable of causing contamination.

Any possible inconvenience, to which the defendant may be subjected in yielding obedience to an injunction, cannot be allowed to enter into the question. *Att'y Gen. vs. Birmingham*, 4 *Kay & Johnson*, 528; *Spokes vs. Banbury Board of Health, L. R.,* 1 *Eq.*, 47; *Att'y Gen. vs. Conley Hatch Lunatic Asylum, L. R.,* 4 *Chan.,* 153; *Gladfelter vs. Walker*, 40 *Md.,* 1.

The fact that the pollution of water which is complained of amounts to a public nuisance, far from constituting any objection to the jurisdiction of equity, furnishes additional reason, under the circumstances of this case, for its interposition at the instance of the city. *Hamilton vs. Whitridge*, 11 *Md.*, 128; *Dittman & Berger vs. Repp*, 50 *Md.,* 516.

The question of the propriety of granting the preliminary injunction must be determined, of course, upon the case stated in the bill, but should long use be set up hereafter as a ground of defence, it is certain that no lapse of time will enable a party to prescribe for a nuisance. *Woodyear vs. Schaefer*, 57 *Md.,* 1; *People vs. Cunningham,* 1 *Denio,* 536; *Mills vs. Hall,* 9 *Wend.,* 315; *Goldsmid vs. Tunbridge Wells Improvement Commissioners, L. R.,* 1 *Eq.*, 161; *Commonwealth vs. Upton,* 6 *Gray,* 473; 4 *Waite's Actions and Defences,* 754; *Wood on Nuisances, sec.* 724.

Nor can it be made matter of defence that other parties are engaged in similar acts tending to the pollution of the stream. *Woodyear vs. Schaefer,* 57 *Md.,* 1; *Gladfelter vs. Walker,* 40 *Md.,* 1.

*R. W. Baldwin,* and *Charles E. Phelps,* for the appellees.

The bill must clearly show a case not of theoretical and possible, but of actual real injury, present or impending, for which a Court of law would award substantial damages. *Adams vs. Michael,* 38 *Md.,* 123.

And the injury must also be shown to be irreparable, and such as could not be fully compensated by an action at law. *Fort vs. Groves,* 29 *Md.,* 188.

A bill for an injunction against the alleged nuisance of a felt-roofing factory, was dismissed for want of precise and definite information upon the following points:

1. Exact distance of factory from complainant's dwellings. 2. Extent of factory. 3. Sort of combustible materials used. 4. Quantity of smoke, &c., likely to be emitted.

Without full disclosure on these points, the Court was unable to conclude whether the factory would certainly be a nuisance. *Adams vs. Michael,* 38 *Md.,* 123, cited and re-affirmed in *Woodyear vs. Schaefer,* 57 *Md.,* 12.

There is no definite information as to the *locality* of the appellant's lands and water rights on the Gunpowder river, conveyed by Patterson and others, nor as to the locality of the appellant's *dam* and *lake* and reservoir, nor as to the locality of the Warren factory, "situated near the Gunpowder river, or one of the tributaries thereof," and consequently no information whatever as to the very material fact of the *distance* between the factory and the lake, which, in connection with the equally serious omission of any information as to the capacity or volume of the Gunpowder, is alone fatal to the complainant's application. *Adams vs. Michael,* 38 *Md.,* 123.

There is no information as to the sort of "injurious ingredients" used in impregnating the "refuse water," nor as to their approximate quantity, relatively to the volume of the stream. (See *Holsman vs. Bleaching Co.,* 1 *McCarter,* 341, cited in *Woodyear vs. Schaefer,* 57 *Md.,* 12.)

The Court is perhaps expected to *infer* that the "large privies" "at or near said factory," are those habitually

used by the factory people, and that the factory people are numerous. If that be the fact, it is a fact that could have been and should have been stated. (46 *Md.*, 76.) But there is an absolute failure to state the extent of the use of those privies and hog-pens, or the approximate quantity of objectionable matter issuing from them, or their locality as respects proximity to the river ("at *or near* said factory," which factory is "situated *near* the Gunpowder river *or* one of the tributaries thereof,") or as to the mode in which their contents are discharged, whether superficially, or by percolation.

It is nowhere stated that the water is effectually polluted at the points of delivery to the consumer. It is not stated that the water is polluted at the reservoir. It is not even intimated that it is in danger of pollution at those places. It is not distinctly and unequivocally stated that the water is polluted even at the lake.

A bill too vague and feeble in its charges to negative such an hypothesis is not an adequate foundation for any relief—certainly not an injunction *ex parte*, and should be dismissed.

But this is not all. The *prayer* of the bill, in its loose generality, goes far beyond the stating part. If all the "hog-pens, et cetera," were abolished, and all the "artificial impurities" stopped, the exigency of the writ prayed would not even then be satisfied. Such an injunction as that applied for, calls for nothing short of the immediate stoppage of the factory itself by preventing its "waste or refuse water" from being returned to the river. It may not have been so intended, but the description in the first clause of the prayer, literally applies to all the innocent working water that passes over the mill-wheel.

The injunction, if granted at all, must be granted as prayed. The Court cannot grant an injunction in other terms than those contained in the prayer of the bill. 2 *High on Injunctions, sec.* 1582; *Burdett vs. Hay,* 33 *L. J. Ch.,* 41; *Kelly vs. M. & C. C.,* 53 *Md.,* 134, 144.

Mayor, &c. of Baltimore *vs.* Warren Manufacturing Co., *et al.*

ALVEY, J., delivered the opinion of the Court.

This is an application by the Mayor and City Council of Baltimore for an injunction against the defendants, to restrain them from polluting the Gunpowder river, the source of supply of water to the city for drinking and other purposes.

By the Code of Public Local Laws, Article 4, secs. 928 to 933, the complainants were authorized to contract for, purchase, and hold in fee-simple, or to lease for a term of years, or, if unable to obtain the same by contract, to have condemned, any land, real estate, spring, brook, water and water-course, or water right, deemed necessary and proper, and to use the same forever, or for a term of years, for the purpose of enabling them to provide for, conduct, and supply the needful quantity of good wholesome water to the inhabitants of the city, for drinking and other purposes.

The bill charges that the complainants, by virtue and in pursuance of the authority thus conferred upon them, did purchase of certain persons, in fee simple, certain lands lying in Baltimore County, adjacent to and including a portion of the bed of a certain natural water-course, called the Gunpowder river, with the water rights appurtenant and belonging to the lands so purchased, including the right to use the water of the stream in its natural, pure and unpolluted condition. That in the exercise of the powers conferred upon them by the statute, and by virtue of the proprietary rights acquired by the purchase of the land before mentioned, they caused to be constructed a dam across the stream, and thereby formed a lake, and that they have also caused to be constructed a conduit or tunnel leading from such dam or lake to a reservoir, situated near the city, and from which reservoir the water is now being distributed to various parts of the city, in order to supply the inhabitants thereof with pure water, for drinking and other necessary purposes. It is further

alleged that the water of the stream, in the manner of its natural and accustomed flow along and down upon the lands purchased by the complainants, and as the former owners of those lands were of right entitled to have the same flow, was pure and wholesome, and perfectly fitted to be used as drinking water for mankind, and for all the purposes of a water supply to a great city. It is also charged that the water works of the city were constructed at great cost, and that the water so derived from the Gunpowder river, and conducted into the city, constitutes by far the larger part of the water supply of the city, and. is indispensably requisite and necessary for the use of the inhabitant, and for the preservation of their health.

The bill then charges that the defendants, a body corporate, own and conduct a certain cotton factory "situate near the Gunpowder river, or one of the tributaries thereof, above the said lake and dam, and that they discharge, or knowingly suffer and permit to be discharged into the said stream, whence the same necessarily flows into the said lake, refuse water from the said factory, *impregnated with divers injurious ingredients and substances,* put into the same by the defendants at said factory; whereby the water of the said natural stream is rendered less pure and less fit for use by man, as drinking water." And as a distinct cause of defilement or pollution of the stream, it is charged that the defendants "have erected, and do keep, maintain and use, divers large privies and hog-pens, at or near said factory, the excrement and filth whereof the defendants cause or wilfully suffer and permit to be discharged into the waters of the said Gunpowder river, above the said dam and lake, whereby the water of the stream so flowing into, and received by the said lake, is greatly polluted." It is also alleged that the complainants requested the defendants to desist from the creation of the nuisances complained of, but that the latter still persist in producing the same.

The prayer of the bill is, that the defendants may be enjoined from causing or permitting the waste or refuse water from the factory from being discharged into the Gunpowder river, or any of the tributaries thereof, above the lake; and from permitting any water containing, or impregnated with, any artificial impurities or substances introduced into the same by the defendants, and which are unfit or improper to be introduced into drinking water for the use of man, to so flow into the stream. It also prays that the defendants be restrained from keeping and using privies and hog-pens along the stream, wherefrom the filth and excrement are discharged into the stream above the lake of the complainants.

We have referred thus particularly to the matters charged in the bill, and the relief prayed thereon, for the reason, that this is an application for a preliminary or provisional injunction, and the right of the complainants to such immediate interposition of the Court depends entirely upon the sufficiency of the facts charged in the bill. If the facts, as stated upon the face of the bill, be not full, and sufficiently definite and clear, in support of the right asserted, and that such right has been violated, in the manner charged, the Court will not order the defendants to be restrained before they are heard in their defence. And in no class of cases is this requirement more necessary to be insisted on than in the class to which the present case belongs; for, in such cases, there is always danger that the injunction, if improvidently issued, may produce serious detriment to the rights and interests of the defendant, before he can be relieved of its operation; and hence, the greatest precaution is necessary to be observed in the use of this summary power of the Court.

Now, with respect to the legal principles upon which the present application is based, we think there can be no doubt or controversy whatever. Before the time of Lord Coke, the principle involved in this case would appear to

have been well settled; for in *Aldred's Case*, 9 *Co.*, 58, 59*a*, we find it laid down by the Court, as established law, that "if a man has a water-course running in a ditch from the river to his house, for his necessary use, and a .glover sets up a lime-pit for calveskins and sheep skins so near the said water-course that the corruption of the lime-pit has corrupted it, for which cause his tenants leave the said house, an action on the case lies for it, as it is adjudged in 13 *H.* 7, 26; and this stands with the rule of law and reason, &c., *Prohibetur ne quis faciat in suo quod nocere possit alieno; et sic utere tuo ut alienum non lœdas.*" And, in more recent times, all common law authorities agree, that a riparian owner has the right to the natural stream of water flowing by or through his land, in its ordinary natural state, both as to its quantity and quality, as incident to the right to the land on or through which the water-course runs; and that right continues, except so far as it may have been derogated from by user or by grant. *Gladfelter vs. Walker*, 40 *Md.*, 1; *Mason vs. Hill*, 5 *B. & Ad.*, 1; *Wood vs. Wand*, 3 *Exch.*, 748; *Stockport Water Works Co. vs. Potter*, 7 *H. & N.*, 160. And no user short of the period of legal prescription will, without consent or grant, confer any exclusive right, as between different riparian owners, to the use of the water of a running stream. If, however, the prior occupant has enjoyed the use of the water in any particular mode, or for carrying on any particular trade or manufacture, for twenty years, so as to have acquired a right of user by prescription, he is, in that case, entitled to remain undisturbed in such user, in the mode and to the extent defined by the actual enjoyment of the use. 3 *Kent. Com.*, 446. Or, as stated by Lord ELLENBOROUGH, in the case of *Bealey vs. Shaw*, 6 *East*, 208, "independent of any particular enjoyment used to be had by another, every man has a right to have the advantage of a flow of water in his own land, without diminution or alteration. But an adverse right may exist,

founded on the occupation of another; and though the stream be either diminished in quantity, or even corrupted in quality, as by means of the exercise of certain trades, yet, if the occupation of the party so taking or using it have existed for so long a time as may raise the presumption of a grant, the other party, whose land is below, must take the stream, subject to such adverse right." And so hold all the authorities of recent times.

Such being the principle that determines the relative rights of the several riparian proprietors along the stream, the question is, whether the complainants are entitled to be regarded as riparian proprietors within the principle? And in respect to this question there would seem to be no real cause to doubt. The complainants were fully authorized by the statute to purchase the land along or over which the stream flows; and they were fully authorized to erect the dam and to make the lake to feed, by means of the artificial conduit or tunnel, the reservoir near the city. Assuming then that the land was acquired as authorized by the statute (as we may well do,) the complainants are riparian proprietors in the strictest sense, in respect of the property purchased and held by them on the stream in question. They are entitled to all the riparian rights to which the parties under whom they claim, and from whom they purchased the land, were entitled at the time of the purchase. Unless derogated from by grant or user ripened into prescription, the complainants are entitled to all the rights of riparian proprietors, and among others to have the stream to flow into and through the lake, in its ordinary natural purity and quantity, without any unnecessary or unreasonable diminution or pollution of the same by the proprietors above. And for this, if authority were necessary, we need only refer to the very thoroughly considered case of *Wilts, etc. Canal Co. vs. Swindon Waterworks Co., L. R.,* 9 *Ch. App.,* 451; and same case on appeal to the *House of Lords, L. R.,* 7 *H. L.,* 697.

If, therefore, the defendants, being upper riparian pro-
prietors, and as such entitled to the ordinary use of the
water, including the right to apply it in a reasonable way
to purposes of trade and manufacture, are using the water
of the stream in an unreasonable manner, and have defiled
the same in such manner and to such an extent as to
operate an actual invasion of the rights of the complain-
ants, the latter are clearly entitled to redress by action at
law, and, in case the nuisance be continued, to summary
relief by injunction.   This is clearly settled by a great
number of decided cases, both English and American
(*Swindon Waterworks Co. vs. Wilts & Berks Canal Co.,
L. R.,* 7 *H. L.,* 697; *Clowes vs. Staffordshire Potteries
Waterwork Co., L. R.,* 8 *Ch. App.* 125; *Pennington vs.
Brinsop Hall Coal Co.,* 5 *Chan. Div.,* 769; *Sanderson vs.
Penn. Coal Co.,* 86 *Penn. St.,* 401; *Chipman vs. Palmer,*
77 *N. Y.,* 51;) and this Court has but recently held, in the
case of *Woodyear vs. Shafer,* 57 *Md.,* 1, that an injunction
should be granted to prevent the fouling and improper
use of the water of a running stream, when prejudicial to
the rights of others interested in having the water descend
to them in its ordinary natural state of purity.   Among
the more recent leading cases upon this subject are those
of *Goldsmid vs. Tunbridge Wells Co., L. R.,* 1 *Ch. App.,*
349, and *Baxendale vs. McMurray, L. R.,* 2 *Ch. App.,* 740,
in which will be found fully discussed the principles and
grounds upon which the Court proceeds in such cases.
What nature and extent of pollution of the stream will
call for the active interference of the Court, is not in all
cases easy to define.   It is not every impurity imparted to
the water, however small in degree, that will be the sub-
ject of an injunction.   All running streams are, to a cer-
tain extent, polluted; and especially are they so when
they flow through populous regions of country, and the
waters are utilized for mechanical and manufacturing pur-
poses.   The washings of the manured and cultivated fields,

and the natural drainage of the country, of necessity bring many impurities to the stream; but these and the like sources of pollution cannot, ordinarily, be restrained by the Court. *Wood vs. Sutcliffe*, 2 *Sim.*, (*N. S.*) 163. Therefore, when we speak of the right of each riparian proprietor to have the water of a natural stream flow through his land in its natural purity, those descriptive terms must be understood in a comparative sense; as no proprietor does receive, nor can he reasonably expect to receive, the water in a state of entire purity. But any use that materially fouls and adulterates the water, or the deposit or discharge therein of any filthy or noxious substance, that so far affects the water as to impair its value for the ordinary purposes of life, will be deemed a violation of the rights of the lower riparian proprietor, and for which he will be entitled to redress. Anything that renders the water less wholesome than when in its ordinary natural state, or which renders it offensive to taste or smell, or that is naturally calculated to excite disgust in those using the water for the ordinary purposes of life, will constitute a nuisance, and for the restraint of which a Court of equity will interpose.

Such is the settled doctrine of the law; but in this case, as the facts are presented on the face of the bill, that part of the case that relates to the refuse water discharged from the factory of the defendants, is not stated with sufficient certainty to justify an injunction on the statements of the bill alone. How such refuse waters are impregnated; by what substance or material, and to what extent, are not stated; nor is the distance of the factory from the lake, or the volume of water of the stream, stated in the bill. It would be impossible to grant the injunction in the terms of the prayer of the bill, as that would put the defendants to the peril of determining what would be a prohibited pollution of the stream. The condition of the water in the lake should be stated, and its pollution,

at least to some appreciable extent, should be shown to result from causes produced by the defendants. The question of distance may not be important; the real question being, whether the water in the lake is really impaired in its fitness or value for the ordinary uses of life, by reason of any foreign substance imparted thereto by artificial means, and whether such pollution arises from the acts or permission of the defendants. The burden of establishing these propositions is upon the complainants, and if they be made out by the facts, to the satisfaction of the Court, the right to relief cannot be defeated otherwise than by the establishment of an adverse right by grant or prescription. *Wood on Nuis.*, secs. 684 *to* 688, and the authorities there cited. But if the right, by grant or prescription, so to pollute the stream, be shown to exist, the only recourse to which the complainants can have, to avoid the cause of the pollution, will be the acquisition of the right by purchase or condemnation, as provided by the statute.

Inasmuch, therefore, as the allegations of the bill, in respect to the alleged pollution produced by the discharge of the refuse water from the factory into the stream, are not sufficiently definite, without the aid of evidence, upon which to found an order for a special injunction, the Court below was right in refusing to grant an injunction as to that ground of complaint. The complainants may obtain leave, however, to take testimony, under the provisions of the statute of 1872, ch. 157, to be used upon motion for an injunction; or they may wait the coming in of the answer of the defendants, and move upon the merits confessed therein, if merits be confessed; but otherwise an interlocutory injunction, as to this part of the case, should not be ordered.

But, with respect to the other ground of complaint, that is to say, the existence of the privies and hog-pens on the stream above the lake of the complainants, the allegations of the bill are more definite. It is distinctly alleged that

the filth and excrement from those erections are discharged into the stream, whereby the water flowing into the lake is greatly polluted. This source of pollution should be restrained; and even though there be other sources of pollution, or that many other persons are committing the same sort of nuisance, it forms no reason why this particular cause or source of pollution should not be restrained. *Crossley vs. Lightowler, L. R.,* 3 *Eq. Cas.,* 279; *L. R.,* 2 *Ch. App.,* 478.

We shall reverse the order refusing the injunction, and remand the cause, that further proceedings may be had in accordance with this opinion.

*Order reversed, and*
*cause remanded.*

(Decided 13th July, 1882.)