GEORGE D. BARRETT *et al.*

*v.*

THE MOUNT GREENWOOD CEMETERY ASSOCIATION *et al.*

*Filed at Ottawa January 20, 1896.*

| 159 | 385 |
|---|---|
| 92a | [1]606 |

| 159 | 385 |
|---|---|
| f95a | [1]528 |

| 159 | 385 |
|---|---|
| 204 | [4]413 |
| 204 | [2]416 |

| 159 | 385 |
|---|---|
| 112a | [5]379 |

1. WATERS—*pollution of stream by drainage of cemeteries—injunction.* The pollution of the waters of a stream used for domestic purposes, watering cattle and harvesting ice, by a sewer draining the wet portions of two cemeteries, will be enjoined.

2. SAME—*fact of former pollution no defense.* It is no excuse for the threatened pollution of the waters of a stream by drainage from cemeteries, that such waters may, to some extent, have been rendered unwholesome when flooded by washings from manured lands or by the connection of other drains.

3. NUISANCES—*pollution of stream is a nuisance.* The rendering of the waters of a stream unfit for drinking and domestic purposes, for watering cattle and harvesting ice, by drainage from cemeteries, constitutes a nuisance.

4. SAME—*pollution of stream cannot be authorized by contract.* Neither a town nor cemetery association has any right, by contract, to authorize the pollution of a stream.

5. ACTION—*cross-bill by town—remedy at law.* A cross-bill filed by a town in a suit to enjoin the pollution of a stream by construction of a sewer under a contract between cemetery companies and the town commissioners of highways, seeking to set aside the contract as made without power in the commissioners, is properly dismissed, as the liability of the town thereunder can be determined when such liability is asserted or denied in some proceeding.

*Barrett* v. *Mount Greenwood Cemetery Ass.* 57 Ill. App. 401, reversed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. R. S. TUTHILL, Judge, presiding.

WHITEHEAD & STOKER, and W. H. HOLDEN, for appellants.

RUNYAN & RUNYAN, for appellees.

HOLDEN & BUZZELL, for appellee the town of Worth.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a bill in equity, filed in the circuit court of Cook county by certain land owners, who are appellants here, to enjoin appellees, two cemetery corporations, from constructing a certain sewer so as to drain their cemeteries, and especially to underdrain certain wet and swampy portions thereof used and to be used in burying the dead, into a running stream of water flowing through appellants' lands. The sewer empties into the brook where it crosses Morgan avenue, above appellants' lands, and is being constructed eastward along said avenue between said cemeteries, with lateral extensions or spurs extending into the cemeteries for drainage, and especially designed to drain certain swampy portions thereof as appear unfit for burial purposes unless underdrained. The sewer is being constructed under a contract between the two cemetery companies of the one part and the commissioners of highways of the town of Worth of the other part, whereby the former are to construct the sewer at their own expense and to pay all damages to private property, and the town is to keep the same open and in repair for the use of the cemetery companies, and the adjoining property owners are to have the right to connect.

There is but little dispute as to the law of the case, the controversy relating chiefly to matters of fact. The testimony was taken by the master to whom the cause was referred. Many witnesses were examined, and the evidence is too voluminous to be set out to any considerable extent here. The testimony shows, however, that said brook is a small, shallow stream, which rises north of Morgan avenue or One Hundred and Eleventh street, in the town of Worth, and flows southerly, fed by springs along its course, across said avenue through the sixty acres of land owned by complainant G. D. Barrett, thence south through a one hundred acre tract owned by complainant W. B. Brayton, and across Raymond avenue or

One Hundred and Fifteenth street, and through land owned by complainant Saxton, and thence through an eighty-acre tract owned and occupied by complainant Ira S. Brayton and eighty acres owned and occupied by Friederich Joehnke, thence across Lyon avenue or One Hundred and Nineteenth street, over a forty-acre tract owned by complainants John T. Dale and George D. Robinson. South of Morgan avenue, two and one-half miles in a direct line but four miles by the brook, complainant August C. Roeber occupies a block of ground on which he has constructed ice houses, and where he conducts an ice business of $5000 or $6000 a year. The brook that runs through the lands of other complainants north of his premises empties into Stony creek about three-fourths of a mile above his place. He has harvested ice from Stony creek and sold the same in Chicago and vicinity for fourteen years past, for refrigerator and domestic purposes. The lands of the other complainants are used for pasturage and farming purposes, and the water of the brook is used for stock, and to some extent is used in the homes of the occupants of the land for domestic purposes. This brook running through said lands receives the washings of the streets, and from manured lands used for raising cabbages adjoining it north of the land of complainants, and in times of freshets the brook is muddy, but is clear in its natural condition. Ditches have been constructed along Morgan avenue, and surface water coming south on Johnson avenue, which intersects Morgan avenue, is carried along these ditches into the brook. Dr. Bayard Holmes testified, as an expert bacteriologist, that bodies buried in boxes of wood would sooner or later be so liquefied as to be practically incorporated with the soil in which they were buried, and that the subterranean drainage of a cemetery draining into a sewer of brick and mortar, as ordinarily built, if drained into a spring brook would carry contamination and pollute such brook for five miles or more, and that brook, being dammed for ice

making within four miles from the cemetery, would result in a pond from which ice of a very pernicious quality would be harvested; that the water from a brook into which such sewage drained would be unhealthy for cows, and unfit for drinking purposes or for cooking-water for domestic use. The testimony of other witnesses showed that the lands through which the brook runs into which the drainage from the cemeteries emptied, would be unfitted for dairy purposes and stock raising by reason of the contamination of the water by the sewage.

We have read and considered all the evidence with care, and are of the opinion that it sustains the conclusions reached by the master. In his report the master found "that injurious products of decomposition do emanate from animal bodies buried in the earth; that these emanations do enter into the soil in which said bodies are buried; that the surface water percolating through the soil takes up these emanations; that if the sewer referred to is constructed, with the lateral drains extending into the said cemeteries referred to in the bill of complaint filed in this cause, these unwholesome products of decomposition will percolate through the soil and penetrate the sewer, and will be carried by the said sewer and emptied into the spring brook, and that the contents of the said sewer will contaminate the waters of the spring brook to a greater extent than they are now contaminated from any cause shown to exist, and will contaminate the waters of the said spring brook to a greater extent than they would be contaminated from any natural cause or from any conditions existing prior to the construction of the proposed sewer;" that the preponderance of the evidence on the main issue was in favor of the complainants, and that the material allegations of their bill were sustained. The circuit court sustained exceptions to this report and dismissed the bill, and its decree has been affirmed by the Appellate Court.

We think there was error in affirming the decree. The very purpose of the sewer was to furnish underdrainage, as well as surface drainage, to these cemeteries. Some portions of their grounds were so wet and swampy that water would rise in openings for graves, when dug, to such an extent as to compel their abandonment and the selection of more elevated ground in their stead. It is true, it was shown that some of the highways of the town would be drained and benefited; but the chief purpose and object in view were to furnish cemetery drainage, and to accomplish this the cemetery companies were willing and agreed to pay the whole expense. Experienced bacteriologists testified that if the sewer were constructed and finished as contemplated, poisonous exudations would be carried from decomposing human bodies, by the percolating waters, into the sewer and from thence into the spring brook, polluting and contaminating its waters and rendering them unfit for use for man or beast, and dangerous to the health of those who should use the water for drinking or domestic purposes or who should use the milk of cows that drank from the brook, and that ice which should be harvested from ponds formed by the brook upon the lands of complainant Roeber would be of a very pernicious quality.

There was some conflict in the evidence on the question as to whether or not the stream would be thus polluted by the sewer, but we think the clear preponderance of the evidence sustains the finding of the master that it would be. It would also seem to accord with the common opinion of mankind that underdrains in wet and marshy land filled with decaying bodies, leading into a running brook flowing within a mile of such land, would pollute the waters of the brook. The evidence does not show, nor does experience or science appear to teach, just how far this pollution would continue in the flowing waters. One witness testified that it might continue from five to fifty miles before the purification would become complete.

But we think it clearly appears that the waters would probably be contaminated by this sewer while flowing through the lands of all of the complainants. Some of these lands were immediately below the mouth of the sewer, and the farthest within four miles. The brook is small, but perennial. It is fed along its course, below the mouth of the sewer, by small springs of pure water rising from the bed of the stream. It flows through the private property of complainants. They used its waters for stock, for cows kept for dairy purposes, for making ice, and, at times, for domestic use.

The defendants attempted to break the force of the case made by complainants by showing that the waters of the brook and the springs along its course were already polluted by the washings from manured lands used in gardening and from decaying vegetables and other refuse matter, and were successful in showing that in wet weather the waters of this stream were rendered impure from these causes. They also showed that another drain of a somewhat similar kind, from Mount Hope Cemetery, discharged its waters into a ravine which in wet weather carried such waters into the brook in question at a point below the land of some of the complainants and above that of others. But we know of no rule of law that sanctions one wrong because another has preceded it. It is doubtless true that streams of water cannot be kept as pure when flowing through lands occupied by populous communities as when flowing through sparsely settled lands; but these effects that unavoidably arise from the occupation and cultivation of the soil by man do not justify the deliberate pollution of a stream of water flowing through private property, in order that the interests of private persons, or even of the public, may be enhanced thereby. There are very few streams of water flowing through a densely populated country which are not more or less polluted from general causes arising from the occupation and cultivation of the adjacent lands. The

courts have no power to prevent pollution so occurring. (28 Am. & Eng. Ency. of Law, 971, note; *Baltimore* v. *Warren Manf. Co.* 59 Md. 96.) But it is a well recognized branch of equity jurisdiction to restrain, by injunction, the fouling of running streams that pass over the lands of others, by connecting sewers therewith or by other means, so as to endanger the comfort and health of others or to cause irreparable injury to their property rights. (2 High on Injunctions, p. 508, secs. 794, 795; *People* v. *City of St. Louis*, 5 Gilm. 351; *Wahle* v. *Reinbach*, 76 Ill. 322; *Metropolitan City Railway Co.* v. *City of Chicago*, 96 id. 620; *Minke* v. *Hopeman*, 87 id. 450; *Catlin* v. *Valentine*, 9 Paige Ch. 575; *Lyon* v. *McLaughlin*, 32 Vt. 423; *Village of Dwight* v. *Hayes*, 150 Ill. 273.) And the mere fact that in the case at bar the waters of this stream may, to some extent, have been rendered unwholesome when flooded by the washings from manured lands or by the connection of other drains is no excuse for the threatened pollution by the cemetery companies. (28 Am. & Eng. Ency. of Law, 968, 974.) It is declared by section 221 of the Criminal Code to be a public nuisance "to corrupt or render unwholesome or impure the water of any spring, river, stream, pond or lake, to the injury or prejudice of others," and the offense is punishable by indictment, but the "bare fact that the statute gives a remedy by indictment does not deprive the court of its equitable powers." (*Minke* v. *Hopeman, supra.*) In *Wahle* v. *Reinbach*, 76 Ill. 322, it was held that a bill would lie to enjoin the erection of a privy so near to complainant's dwelling and well of water as that it would become injurious to the health and comfort of himself and family, and after citing previous decisions of this court it was said (p. 325): "These cases, however, recognize the doctrine, which is supported by all the authorities on this branch of equity jurisdiction, that where the injury resulting from the nuisance is, in its nature, irreparable, as, when loss of health, loss of trade, destruction of the means of subsistence or permanent ruin

to property will ensue from the wrongful act or erection, courts of equity will interfere, by injunction, in further-ance of justice and the violated rights of property." In-junctive relief will be granted to prevent one proprietor from causing filthy or contaminated water to percolate from his soil into adjoining lands to the injury of his neighbor.    27 Am. & Eng. Ency. of Law, 437.

The evidence does not sustain appellees' contention that the purpose of the sewer is mere surface drainage, or the carrying off more rapidly of waters from the surface of the cemetery grounds which, by the slower processes of percolation and natural drainage, would eventually find their way to the same stream and in a more impure condition.    The contract shows that the sewer was to be at all times kept open, and to be used by the two ceme-teries for carrying away all surface water *and as a drain for said cemeteries, and the plan and purpose of construction show that one of its principal objects was the underdraining of the wet and swampy portions of the cemeteries, and much the larger portion of the evidence relates to the effect the decaying bodies buried in the cemetery would have on the percolating waters which it is intended the sewer should carry off into this brook.*

In *Robb* v. *Village of LaGrange,* 158 Ill. 21, it was said : "Under the ruling of this court, which we believe to be in harmony with the current of authority bearing on the question, a village or city cannot run its sewage beyond the incorporated limits and empty it on the adjoining premises of some land owner, where a stench is created and the sewage is detrimental to the health of the neigh-borhood.    Nor will a village or incorporated town be permitted to empty its sewage into a stream of water where the result is the pollution of the stream.    In other words, if a nuisance is established by carrying the sew-age of a village, incorporated town or city in a drain or sewer beyond the limits of the incorporation, a bill in equity will lie on behalf of any person injured.    The real

question in the case then is, whether the evidence is sufficient to establish a nuisance." And in view of the fact that the witnesses were examined in open court, in that case, when the cause was heard, and that the trial judge, at the request of the parties, went upon the *locus in quo* and personally viewed the premises, and found, as a matter of fact, that no nuisance was created, this court declined to reverse such finding, but did hold that in view of the fact that the bill was filed before the sewer was completed, and the trial was had before it could be satisfactorily determined whether the final result of the sewer would be to create a nuisance or not, the bill should have been dismissed without prejudice.

Under the facts proved in the case at bar, we are satisfied, as found by the master, that a nuisance would be created, and that the decree should have been for the complainants.

The town of Worth filed a cross-bill to set aside the contract on the ground that the commissioners had no power to make it, and because it was not made or authorized at any meeting of the commissioners. It is plain that neither party had any right, by contract, to authorize the pollution of the stream in question. But we see no occasion for setting aside the contract. It will be time enough to consider how far the town is bound when its liability under the contract is asserted or denied in some proceeding making such consideration necessary. We hold, therefore, that the circuit court erred in dismissing the bill of complaint but did not err in dismissing the cross-bill.

The judgment of the Appellate Court and the decree of the circuit court, except as to the dismissal of the cross-bill, are reversed, and the cause is remanded to the latter court with directions to enter a decree in accordance with the prayer of the bill of complaint.

*Reversed and remanded.*