City of Springfield and Springfield Sanitary District, Appellees, v. North Fork Outlet Drainage District, Appellant. W. O. Matthew et al., Defendants.

Gen. No. 8,127.

DOBBINS & DOBBINS and LESLIE J. TAYLOR, for appellant.

W. E. SAMPSON, A. D. STEVENS, ROY M. SEELEY and CLAYTON J. BARBER, for appellees.

MR. JUSTICE ELDREDGE delivered the opinion of the court.

This is an appeal from an order entered in the circuit court of Sangamon county granting an interlocutory or temporary injunction *pendente lite,* restraining appellant from further proceeding in the work of straightening the course of the North Fork of the Sangamon River. The averments in the original bill, in so far as they are material to be considered on this appeal, are in substance as follows: that the complainant, City of Springfield, has a population of about 70,000 inhabitants, embraces an area of 11 square miles and is situated about 2 miles south of the Sangamon River, which flows in a general westerly direction; that it owns and operates a system of municipal waterworks which includes pumping and filtration plants located on the south bank of said river; that for more than 40 years said city, as an adjunct to its waterworks system, has maintained a dam therein so as to impound the water in the channel thereof and maintain the water level above the natural summer stage thereof at a height of 10 feet at the site of said waterworks and at a height of 6 feet at the bridge over the same on highway No. 10, near the village of Riverton; that by means of said waterworks system the water supply

of said city is obtained by filtration from said river and the underlying strata in the basin thereof.

That complainant, the Springfield Sanitary District, embraces within its boundaries 36 square miles of territory, including all of that within said City of Springfield, and was organized for the purpose of constructing and maintaining a system of intercepting sewers and treatment plant to collect, purify and dispose of the sewage of said district and to save and preserve from contamination the water supply thereof with regulatory powers to that end for a distance of 15 miles from the source of such water supply; that said district is now engaged in and within six months will have constructed a system of intercepting sewers and other public works for the purpose of disposing of the sewage of said city and territory so as to prevent contamination of said river into which all the streams in the vicinity of said City and said Sanitary District naturally discharge and to prevent any sewage from said Sanitary District from entering the water of said river above said dam.

That the Sanitary District of Decatur, defendant, includes within its territory the corporate limits of the city of Decatur, which has a population of about 55,000 inhabitants, and also outlying farm lands adjacent thereto in the town of Decatur; that the city of Decatur is situated about 40 miles east of the City of Springfield near to and upon said Sangamon River, which flows thence in a general westerly direction towards and north of the City of Springfield; that the Sanitary District of Decatur was organized for the purpose of constructing and maintaining plants for the purification of the sewage of said district and protect from contamination the water supply of the inhabitants thereof; that although said Sanitary District of Decatur has constructed a system of intercepting sewers and other works for the collection, treatment and disposal of the sewage of said district, yet said system

and works are greatly inadequate to properly treat and purify said sewage; that the sewage of said city and Sanitary District of Decatur, including much offensive industrial waste, is now being carried and discharged, in its unpurified state, into the Sangamon River to such an extent that the stench therefrom in summer can be smelled for a distance of more than a mile from the point of discharge.

That the course of said Sangamon River between the cities of Decatur and Springfield is very winding and tortuous, with a channel of irregular width and depth, having a total length following the sinuosities of the channel between said Riverton bridge and the west line of the Sanitary District of Decatur, of about 50 miles, said channel, in many places, being more than 10 feet deeper than further down stream, and having therein many pools and natural dams as well as drifts of logs and other obstructions tending to retard and accumulate the waters and make the flowage thereof more nearly uniform throughout the seasons of the year, so that the flow of the waters is very much retarded, thereby affording such time and opportunity for dilution, settling, oxidation, evaporation and other natural purification of the sewage and other impurities contained therein before the waters of said stream reach the impounding dam and waterworks system of the City of Springfield, as to not injuriously affect its water supply.

That the defendant, North Fork Outlet Drainage District, as originally organized, included the alluvial lands along the Sangamon River extending from the west boundary line of the Sanitary District of Decatur westerly for a distance of about 24 miles to a point one mile below the Roby bridge and by subsequent proceedings the western boundary was extended down said river a further distance of about 11 miles to said bridge over said highway No. 10 near Riverton, which point is approximately 5 miles by channel from said water-

works of the City of Springfield; that said Outlet Drainage District has completed the construction of a ditch extending from a point in said river known as the Niantic bridge westerly to a point about one mile below said Roby bridge and that by means thereof the course of the water in said river between said points was reduced from 22.2 miles to a distance of 15.80 miles and the fall greatly increased to a uniform fall of 2 feet to the mile and the water in said stream, including all sewage and impurities therein, was thereby caused to flow at a greatly increased rate down a well-defined and straightened channel at a speed of from 6 to 8 miles per hour; that said Outlet Drainage District is now engaged in constructing a further ditch to connect with and to extend the aforesaid ditch upstream from the said Niantic bridge to the western boundary of said Sanitary District of Decatur and to the point of the outlet of the Sanitary District of Decatur into the Sangamon River, which said channel, when completed, will shorten the course of the waters of said river from 10 miles to 8.55 miles between said points; that said channel will have a bottom width of 40 feet, a uniform grade of 2 feet to the mile and will accelerate the speed of the current, including the sewage and impurities therein, to a speed of from 6 to 8 miles per hour and thereby prevent the purification of said sewage by oxidation, etc., and will cause said sewage and impurities to enter into and pollute the impounding dam and waterworks of the City of Springfield; that said Outlet Drainage District has made and filed plans for and is now further intending to construct a new channel along said Sangamon River from a point near the Roby bridge thence downstream to said Riverton bridge of a bottom width of 60 feet, an average depth of between 11 and 12 feet, and a uniform grade of 2 feet to the mile and shorten the distance between said points from 16.1 to 10.95 miles and has ordered an assessment to be spread against

the adjacent lands supposed to be benefited thereby; that if such last-mentioned ditch should be so constructed and the course of the waters of said river between the two points last named so reduced and shortened and the flow thereof so increased and accelerated, the sewage and impurities contained in such stream will be carried with greatly increased velocity and with little or no natural purification to said impounding dam and waterworks system of the City of Springfield.

That in its natural state the course of the Sangamon River between the cities of Decatur and Springfield, being very winding, tortuous, irregular and obstructed as aforesaid, the said sewage and impurities discharged into said river by the city and Sanitary District of Decatur, oxidize, evaporate, settle and become purified by natural means before reaching the impounding dam of the City of Springfield and do not injuriously affect its water supply, but by the construction of the new channel, as aforesaid, the course of the flow of the river between said cities will be shortened from 49.2 miles to 35.3 miles, the fall thereof increased to 2 feet per mile and the rate of flow increased to a speed of 6 to 8 miles per hour, and, by reason thereof, the impurities and sewage aforesaid will have little or no opportunity to become purified by natural means as the same would occur with said stream in its former and natural state, but will be carried to the impounding dam and waterworks of the City of Springfield, thereby polluting the water supply of said city and rendering it unfit for use by the inhabitants thereof.

Thereafter an unverified amendment to the original bill was filed in which it is alleged that the Sangamon River is a navigable river and that the Outlet Drainage District, before commencing any of the work of shortening or straightening the course of the Sangamon River, had not submitted any plans to or obtained the approval thereof by the Department of Public

Works and Buildings, as required by "An Act creating a rivers and lakes commission for the State of Illinois and defining the duties and powers thereof," in force July 1, 1911, Cahill's St. ch. 19, ¶ 59 *et seq.*

The issues raised by the joint and several answer of the Outlet Drainage District and its commissioners are, in substance, as follows: that said Drainage District had expended approximately $300,000 on said work and that the landowners in said district were being assessed to pay therefor, and that the bonds of said district had been sold and made a lien upon the lands therein, all of which the complainants well knew and by reason of their delay in objecting to the work done by said district, if they had any right to object thereto, they are now estopped from raising any objection thereto; they deny that the condition of said stream, prior to the construction of the work, aided in any way in the natural purification of the sewage from the city of Decatur and that the City of Springfield is not entitled to use the lands of the landowners in said drainage district for the purpose of purifying the sewage from the city of Decatur or impurities thrown therein by other persons; that the construction of the work already done and to be done by said Drainage District of Decatur instead of injuring the water of the river at or near the dam of complainants has, by means of the rapid circulation thereof, aeration, and the exposing of the same to sunlight, aided in purifying the same and in increasing the oxygen contents thereof; that any impurities thrown into said river by others have no right in said stream and defendants are, in nowise, responsible therefor; that all the work is being done in the matter of improving a natural stream and will take no water out of its natural course, but the same is being carried in its natural course to the lands of the complainants; that defendants may legally improve and increase the flow of the water in said natural stream so long as they in nowise pollute the same and

so long as they bring no water into said stream out of its natural course and carry the water from off the lands of said Drainage District of Decatur in the course in which the same left the lands of said district in the course of nature, even though the flow of the waters are by artificial means increased; that defendants have done nothing and allowed nothing to, in any way, pollute the waters of said stream or which they have not a right and duty to do under the law; that any rights that the complainants may have to prevent pollution of the river lie wholly against persons who are polluting the same and not against said defendants; and deny that the wrongful acts of others can deprive said defendants, or the owners of the land in said drainage district, of their legal rights to improve the drainage of their said lands and the outlet therefor.

The motion for a temporary injunction was heard upon the bill, answers and affidavits. The North Fork Outlet Drainage District only appeals from the decree granting the injunction.

It seems expedient to first consider the proposition advanced by the amendment to the bill, because, if it is well founded, a determination of the other issues raised will be unnecessary. The contention presented by the amendment is based upon section 29a of the Rivers and Lakes Commission Act, chap. 19, Smith-Hurd Rev. St., which provides as follows: "Before any drainage district now or hereafter organized in this State shall undertake any work which will increase the flow of water to be discharged into any of the streams of this State or which will involve any change in the natural course of any stream, work therein, or improvement thereof, such district or districts shall submit the proposed plans for such work to the Department of Public Works and Buildings for approval." Cahill's St. ch. 19, ¶ 90.

By section 18 of the same act it is provided: "Wherever the terms public waters, public bodies of

water, or streams and lakes are used or referred to in this Act, they shall be construed to mean all open public streams (except as to any sanitary district channel now constructed or being constructed) and lakes capable of being *navigated by water craft, in whole or in part, for commercial uses and purposes,* and all lakes, rivers, and streams which in their natural condition were capable of being improved and made navigable, or that are connected with or discharge their waters into navigable lakes or rivers within, or upon the borders of the State of Illinois, together with all bayous, sloughs, backwaters, and submerged lands that are open to the main channel or body of water and directly accessible thereto.'' Cahill's St. ch. 19, ¶ 76.

Section 29a has no application to any river unless it is a navigable stream or one of the public waters of the State as defined by section 18. *Gottschall v. Zipple,* 308 Ill. 428. The status of the Sangamon River in regard to its navigability has been judicially determined by the Supreme Court of this State. In the case of *Central Illinois Public Service Co. v. Vollentine,* 319 Ill. 66, the court held: ''The Sangamon river is a stream over which commerce cannot be carried on in the customary modes in which such commerce is conducted by water, and is therefore not a navigable stream and is not among the public waters of the State, nor can it be made navigable by mere legislation. (*Hubbard v. Bell,* 54 Ill. 110; *People v. Economy Power & Light Co.,* 241 Ill. 290.) The river is therefore not under the exclusive jurisdiction of the Department of Public Works and Buildings, but for the purposes in question in this suit is under the jurisdiction of the Commerce Commission.'' This court is therefore bound to take judicial notice of the fact that the Sangamon River is not such a stream as comes within the purview of the act mentioned. Also, the amendment to the bill was not sworn to, and it is indispensable to a right to a temporary injunction that all the material

facts alleged in the bill be properly verified by affidavit. *United Romanian Meat Market & Grocery Store v. Abramson,* 218 Ill. App. 577; *Patterson v. Johnson,* 214 Ill. 481; *Jones v. Kennicott,* 83 Ill. 484. Finally, the chancellor, in granting the temporary injunction, did not base his decree upon the grounds set forth in the amendment but his findings of fact, as set out therein, are as follows: "That the alterations already made, now being made and contemplated, by the defendant said North Fork Outlet Drainage District and the defendant Fred M. Crane Company, its contractor, do and would greatly accelerate the flow of the waters of the Sangamon river between the City of Decatur, Illinois, and the impounding dam of the complainant City of Springfield, and do and would cause the water supply of the inhabitants of the complainants City and Sanitary District to be polluted to a much greater degree than does or would exist with the Sangamon river in its natural condition; and that the *further shortening and alteration* of the course of the waters of said Sangamon river, as contemplated by the defendant said North Fork Outlet Drainage District would cause the water supply of the inhabitants of the complainants to be further polluted, to the detriment of the public health of the inhabitants of the said City of Springfield and said The Springfield Sanitary District."

The vital and material question in the case is, has appellant the right under the drainage laws of this State, to straighten the course of the Sangamon River in the manner mentioned, if such action will result in such an increased pollution of the waters thereof as to destroy its use for domestic purposes by the servient proprietors, the Springfield Sanitary District and the City of Springfield. Appellant claims its right to do so by virtue of sections 65a and 57 of the Act of 1879 and the amendments thereto in regard to Drainage for Agricultural, Sanitary and Mining purposes. Ca-

hill's St. ch. 42, ¶¶ 65, 55. In chapter 48, Smith-Hurd Rev. St., it is provided by section 65a: ''When any river or other stream or watercourse in this State constitutes the common outlet for two or more drainage districts heretofore or hereafter organized under any of the laws of this State, and also constitutes the outlet for the drainage of lands not organized into a drainage district, and when it will be a benefit to the lands included in said drainage districts and to said lands not so included but having said river or watercourse as the outlet for drainage, for agricultural or sanitary purposes, that said river, watercourse or other stream or any portion thereof constituting such common outlet be deepened, widened or otherwise improved or that the channel thereof be changed or straightened, an outlet drainage district may be organized in the manner provided in this Act for the organization of drainage districts, * * *.'' Cahill's St. ch. 42, ¶ 65. Appellant was organized under this Act. Section 57 provides, among other things: ''And to secure complete drainage of the lands within any drainage district, the commissioners are hereby vested with full power to *widen, straighten, deepen* or *enlarge* any such watercourse, or remove *driftwood* or *rubbish* therefrom, whether such watercourse is situated in, outside of or below any drainage district.'' Cahill's St. ch. 42, ¶ 55. The word ''rubbish'' in its construction, is governed by the doctrine *ejusdem generis* and refers to such solid matter or debris as is of the same species as driftwood, that is, such as would naturally be carried or accumulated in the flow of a watercourse, and can have no reference to sewage or such things as would cause pollution placed therein by artificial means. It was held in *City of Kewanee v. Otley,* 204 Ill. 402: ''It is the right of every owner of land over which a stream of water flows, to have it flow in its natural state and with its quality unaffected. The right to a stream of water is as sacred as a right to the soil over which it flows.

It is a part of the freehold, of which the owner cannot be disseized except by due process of law, and the pollution of a stream constitutes the taking of property, which may not be done without compensation.'' It follows that a servient estate has a right, as a part of its freehold, to have the water flow in a stream free from pollution and he cannot be deprived of this right by legislation. To hold that the above sections of the statute attempted to give a drainage district the right to straighten the course of a stream in such a manner as to cause it to carry sewage and pollution into its waters to such an extent as to deprive a servient proprietor of its use for reasonable and proper purposes, would be in effect to hold these sections of the statute unconstitutional. While this court is not authorized to pass upon the constitutionality of an act of the legislature, yet it has the right to construe a statute and will always give it that construction, if possible, as will uphold its constitutionality.

It will never be presumed that the legislature intended to pass an act in violation of the restrictions of the constitution and if the purposes of the act can be fully carried out by a construction thereof which will not bring it within the inhibitions of the constitution that construction will be adopted.

Nor can appellant avoid the responsibility of its acts by the fact that the Sanitary District of Decatur and the city of Decatur were responsible for placing the sewage in the river. In the case of *City of Kewanee v. Otley, supra,* it was further held: ''The further contention of counsel for appellant, that the objectionable sewerage came from some other source than that of appellant, is also untenable. * * * Though other sources than that of the defendant city may have been responsible for the collection of this objectionable sewage, such fact furnishes no defense to the defendant here, if it in fact contributed to the

nuisance complained of and participated in the pollution of the waters that caused injury to appellees."

The cases chiefly relied upon by counsel for appellant to sustain their contention are those of *Fenton & Thompson R. Co. v. Adams,* 221 Ill. 201, and *Brown v. McAllister,* 39 Cal. 573. In the former case the natural course of the water over the dominant estate was in a southerly direction to and across the right of way of the railroad company. A ravine ran across the northeast portion of the lands through which the natural flow of the water was towards the northwest. In freshets the waters descending through this ravine toward the northwest overflowed the lands and entered the natural watercourse on the west. To obviate this the owner constructed a dam in the ravine and contemplated constructing a new ditch connecting the ravine with the natural watercourse. The railroad company filed a bill seeking to enjoin the construction of the proposed new ditch, charging that it would cast large quantities of water and debris upon the right of way of the railroad company, which, but for said proposed ditch, would be carried into the basin, where the debris would remain and where large quantities of water would evaporate and seep away and never reach the right of way of the railroad company. The court held: "Any drain that accelerates the flow of water will increase the amount of solid matter that it carries to the servient estate, and we do not think it is a good objection to the exercise of the right of a dominant proprietor to say that the increased flow will carry debris beyond the boundary line, which would not reach there except by reason of the artificial drainage." There was no question of the pollution of the water, by draining thereinto any noxious or unhealthful matter, involved in that case. The effect of this decision is to hold, that under the facts shown, the dominant proprietor had a right to dig the ditch in question although by so doing additional driftwood

and debris would be carried upon the servient estate. There is a vast difference between the natural debris carried by flowing streams and pollution cast therein by artificial means. In the case of *Brown v. McAllister, supra,* the facts disclosed that in the City of San Francisco there were three adjacent lots upon a declivity. The highest lot was occupied by a number of Chinamen, the middle lot by the defendant and the lowest lot by the plaintiff; that foul and offensive water, caused by a Chinese hospital and cigar factory situated upon the highest lot, flowed across the lot of the defendant upon the premises of the plaintiff and percolated through the walls of his building thereby injuring the same. The theory of the plaintiff was that it was the duty of the defendant to prevent the passage of the offensive matter flowing from the dominant estate, across his land on to that of the plaintiff. The court there held: "But the proposition that it was 'necessary for the defendants to prevent the passage of offensive matter flowing from the land of others across their land on to that of the plaintiff,' in order to escape responsibility to the plaintiff for the damage which resulted therefrom, is not tenable. The rule founded on the maxim *'Sic utere tuo ut alienum non laedas'* has never been carried so far. If the defendant had no control over the property lying on the declivity above his lot, nor over the persons who occupied it, and if, without any fault of his, offensive water thrown upon the upper lot *flowed naturally* across his premises on to the lot of the plaintiff, we can perceive no reason, founded in law or justice, why he should be amenable to the plaintiff for the damage which ensued. * * * But we are not to be understood as deciding that the defendant is not responsible for any damage to the plaintiff, either *caused, promoted or increased by any act of his,* or by any negligence on his part to provide proper drainage for carrying off offensive water or other matter from

his own lot, except such as may flow across it from lots above it in the manner already indicated.'' This opinion holds, inferentially, if not expressly, that the defendant would have been liable for damage to the plaintiff if such damage had been either caused, promoted or increased by any act of his. In the case of *Mississippi Mills v. Smith,* 69 Miss. 299, it appears that the plaintiffs owned a tract of land through which a small stream of pure water originally ran; that on one of the branches of this stream, above them, the defendant erected a cotton and woolen mill more than 20 years before the suit was brought, which mill was located near some springs from which the branch of the stream took its origin. The defendant dug a pond about the springs, dammed up the water and with a pump forced the water from the pond into its dye house and through the closets in its mills. The water, after being so used, was returned to the stream, below the pond, and from thence flowed into the stream on the plaintiff's land. The defendant had thus used the water for more than 20 years, but during that time the stream below the pond was small and its bed crooked and filled with large holes in which the water would, to a great degree, stagnate and deposit much of its impurity before reaching the lands of the plaintiffs; that in same parts of the defendant's land it spread out over a field on which much of the polluting matter was deposited; that after this use and condition had prevailed for more than 20 years, about 5 years before the suit was brought, the defendant, for the purpose of accelerating the flow of the water and preventing the deposits in the bed of the stream on its land, or on the field, dug a ditch by which the channel of the stream on its lands was straightened, the result of which was that the befouled water was hastened to the stream on the land of the plaintiffs; that before the ditch was cut plaintiffs suffered but little inconvenience or injury because of the pollution of the

water, but that since the cutting of the ditch the foul and polluted water, continuously and in large quantities, was passed into the stream on their land, rendering its water unfit for any purpose and creating a stench throughout its course. It was held that the right secured by prescription to pollute the waters of a stream must be limited by the character and extent of the right exercised during the prescriptive period and that for any increase causing material injury to riparian owners, damages might be recovered. We think the principle announced in the latter case is in conformity with the long-established law of this State. *Evans v. Merriweather,* 4 Ill. 492; *Village of Dwight v. Hayes,* 150 Ill. 273; *City of Kewanee v. Otley, supra; Sutton v. Findley Cemetery Ass'n,* 270 Ill. 11; *Tetherington v. Donk Bros. Coal & Coke Co.,* 232 Ill. 522; *Beidler v. Sanitary Dist. of Chicago,* 211 Ill. 628.

If the acts of appellant in straightening the course of the Sangamon River contribute to causing a pollution thereof, it is no defense that the city of Decatur and the Sanitary District of Decatur contributed thereto or may be the chief offenders. *Kewanee v. Otley, supra; Barrett v. Mt. Greenwood Cemetery Ass'n,* 159 Ill. 385; *Voss v. Chicago Sandoval Coal Co.,* 165 Ill. App. 565. The right of each proprietor to use a stream is subject to a like reasonable right in other riparian owners and each must submit to such reasonable use by the other so long as such use does not inflict substantial injury upon the others who have a like right. *Tetherington v. Donk Bros. Coal & Coke Co., supra.*

The City of Springfield is a proper complainant because a municipality may maintain a bill for injunction to restrain an injury to its public water supply, and in such an action is vested as representing the public interest, with all the rights of a riparian owner. *City of Pana v. Central Washed Coal Co.,* 260 Ill. 111;

*Kenilworth Sanitarium v. Village of Kenilworth,* 220 Ill. 264.

It is urged by appellant that the remedy of the City of Springfield is by bill for injunction to restrain the city of Decatur and the Decatur Drainage District from depositing the sewage of said city into the river. So long as the sewage and pollution in its natural flow down the river does not reach the City of Springfield, the latter suffers no damage by reason thereof and has no cause for injunction against the city of Decatur or the Sanitary District of Decatur. If it should be necessary for appellant, in carrying out the purposes of its organization, to straighten and shorten the course of the Sangamon River, and if it be a fact that such further shortening of the river, as contemplated, will cause such a pollution of the waters thereof as to damage the water supply of the City of Springfield, then it is the duty of appellant to take such steps as will abate the nuisance before it proceeds with the contemplated work, so that no harm, by pollution, will result thereby to the servient proprietors. Appellant may or may not, as it sees fit, permit the waters and lands within its jurisdiction to act as a reservoir for the sewage of the city of Decatur, but it cannot rid itself of such pollution by causing the same to flow upon or through the lands of servient proprietors to the injury of the latter.

As to the merits of the case, which can only be determined upon the final hearing, we express no opinion. Whether such straightening and shortening of the Sangamon River, as contemplated by appellant, would, in fact, carry said pollution to the impounding dam of the City of Springfield and thereby injure or ruin its water supply, is a matter to be proven largely by the testimony of experts in sanitary engineering and those versed in such matters. A temporary injunction is merely an interlocutory writ, the purpose of which is to preserve the status of the parties until

the court can determine the merits of the controversy. *Lambert v. Alcorn,* 144 Ill. 313; *Thomson & Taylor Spice Co. v. I. Lanski & Son Scrap Iron Co.,* 209 Ill. App. 331; *Paxton v. Fabry,* 200 Ill. App. 104; *Hillmer Co. v. Behr,* 196 Ill. App. 363. The verified bill and the affidavits filed in support of the motion tend to sustain the contention of appellees, while the answer and affidavits filed by appellant tend to support its theory that the pollution, after the contemplated improvement should have been completed, would never reach the impounding dam and no injury could result to the water supply of the City of Springfield. Under these conditions, the chancellor did not exceed his discretion in granting the temporary injunction.

It is next contended by appellant that appellees are estopped by laches from now prosecuting its suit for an injunction. It is pointed out that they were fully aware of the fact that appellant had straightened several miles of the course of the river and had expended large sums of money in prosecuting said work, which had been paid by assessments upon the lands within the North Fork Outlet Drainage District and by its delay in objecting to said improvement, in equity, they should not now be allowed to enjoin its completion. As we understand, from the pleadings and the proofs, up to the time the bill was filed by appellees, no material pollution of the waters at the impounding dam had taken place, but the theory of appellees is that the further shortening and straightening of the channel of the river as contemplated will cause the injury complained of. Appellees are not attempting to cause to be undone anything that has already been done, but to enjoin the doing, in the future, of things which will inure to appellees' injury. The defense of laches has no application under these circumstances.

Appellees have assigned cross errors because of the failure of the chancellor to enjoin appellant from pros-

ecuting its petition in the county court of Christian county seeking to recover money from the Decatur Sanitary District for furnishing it an outlet for sewage, and because of the failure to enjoin the Decatur Sanitary District from paying any money to appellant in settlement of said claim. It is of no concern to appellees what action appellant may take in the county court of Christian county in regard to the matters mentioned and the cross errors are overruled.

The chancellor properly granted the motion for a temporary injunction and upon a proper basis. The decree of the circuit court is affirmed.

*Affirmed.*