# THE WEST ARLINGTON IMPROVEMENT CO. *vs.* MOUNT HOPE RETREAT IN BALTO. COUNTY.

*Pollution of Watercourse—Injunction—Pollution Contributed to by Plaintiff—Laches.*

The fact that a riparian owner constructs a lake along the bed of a stream flowing through his land and uses the water so collected for the purposes of a hospital does not disentitle him to maintain a suit to prevent the pollution of the stream by an upper riparian owner, when it is not shown that lower riparian owners are injured by such diversion of the water, or that they have not assented to such use.

It is no defense to a bill to restain the pollution of a stream of water that the plaintiff polluted another steam flowing upon the land of third parties.

When a bill charges the pollution of a stream by the defendant's emptying into it sewage from water closets, the fact that a hog pen on plaintiff's land also contributed to the contamination of the water in a different way, is no bar to a relief against the defendant.

The fact that other persons also cause the pollution of a stream is no defense to a bill to restrain that caused by the defendant.

The plaintiff, a corporation maintaining a hospital, owns a tract of land through which flows a stream of water that was formerly pure. The corporation constructed a lake on its land to accumulate the water and pumped it thence into the hospital. The water had been so used for a number of years when the defendant company, an upper riparian owner, built sewers and drains which emptied refuse and sewage from water closets into the stream polluting it to such an extent that its use became dangerous to health. Upon a bill for an injunction to restrain defendant from so contaminating the water, *held*,

1st. That there is no evidence to show that the construction of the lake and the use of the water by the plaintiff injured lower riparian owners and plaintiff is not disentitled in equity to ask for relief against the defendant, an upper riparian owner.

2nd. That neither the circumstance that the sewage from plaintiff's hospital is emptied into another stream and discharged upon the land of third parties, nor that a hog pen on plaintiff's land also defiled the stream, nor that other parties also contributed to the pollution of the water, constitutes any equitable ground for denying relief to the plaintiff.

3rd. That plaintiff's delay in applying for the injunction in this case until after the construction of its sewerage system by the defendant is not such laches as to be a defense to the bill.

Appeal from a decree of the Circuit Court for Baltimore County (FOWLER, C. J., and BURKE, J.)

The cause was argued before BRISCOE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Frank I. Duncan* and *Edgar Allan Poe* (with whom was *John P. Poe* on the brief), for the appellant.

It appears from the testimony, that the appellees, while complaining that the appellants, by their sewage, are contaminating the alleged stream upon which they say they rely in part for the water supply for their seven hundred and more officers, employees and patients of their institution, are discharging their sewage into Powder Mill Run and thence into Gwynns'

Falls, thus inflicting upon the neighboring riparian owners below them the same wrong which they seek to restrain the appellants from inflicting upon them. This fact is of itself sufficient to induce the Court to decline the extraordinary remedy of injunction and to leave the appellees to their action at law.

The case is pre-eminently one for the application of the maxim, that in order to entitle a suitor in equity to the relief prayed he must come into Court with clean hands, and not be guilty of the very wrong against others which he charges the defendant with perpetrating upon him.    43 Kansas, 416–418; *Phelps' Equity*, section 257.

Nay more, the proof shows that the very wrong and injury that the appellees are now complaining of are the direct result of their own illegal conduct. For according to the contention and testimony of the appellees, a number of years ago the water of a living stream was arrested in its course and collected and stored on their property in a lake especially constructed for that purpose. This was a clear violation by them of the rights of the lower riparian owners who were entitled to the free and unobstructed flow of this water. Manifestly a Court of equity will grant them no aid in protecting what they have thus illegally acquired. Yet this is just what they are asking the Court to do.

But this is not all. Conceding that the water that empties into the appellees' lake is contaminated by the sewage of the appellants, it is nevertheless shown that one source of pollution of the water of the same lake is a stream entirely on the property of the appellees and completely under their control. The pollution of this stream is caused by the filth and excrement from an adjoining hog pen maintained by the appellees on their property. Pollution of water by such a source was enjoined by this Court in the *Warren Manfg. Co. case* in 59 Md. 96. The appellees are thus directly themselves contributing to the wrongful act that they charge the appellants with committing and against the perpetration of which they ask for an injunction.

Being joint tort feasors, they cannot be heard to complain.

This point was expressly raised and decided in 77 Iowa, 576, where the Court says: "It is contended by the appellee that he is entitled to recover if a wrong has been proven notwithstanding the fact that he may have contributed to it. We do not think his position is well taken. 'If he contributed to the wrong, he and defendant were joint wrong doers. In law, the act of each was the act of both."

Just as one wrong doer polluting a stream cannot justify his misconduct by showing that third parties are contaminating the water to even a greater extent than he himself, so in like manner the appellees' right to an injunction is lost by proof of pollution on their part, even though such pollution is of a slight character as compared with that on the part of the appellants.

The proof fails to show the existence of the pure stream, the right to the use of the unpolluted and uncontaminated water of which the appellees claim. Perhaps many years ago there might have been such a stream, but long before the West Arlington Improvement Company purchased and began the development of its property this stream, the water of which years ago may have been potable and fit for domestic uses, had lost all its original purity and had ceased to be fit for anything but a ditch and sewer. The testimony leaves no doubt that before it touched the land of the West Arlington Improvement Company it had become so defiled as to be incapable of any beneficial use by that company and its grantees, and the appellants might just as well seek an injunction against the riparian owners above them to restrain them from the use which for years they have made of this ditch and sewer as the appellees may properly ask against the appellants.

The waters of this pretended stream when they reach the lands of the appellants are so foul and unfit for use that it is quite impossible to add to their worthlessness, and the injunction granted by the Court below, the testimony shows, is one which cannot possibly be made effective. It is to be borne in mind that the neighborhood through which the stream flows is being rapidly developed and becoming thickly populated,

and as was said in *Wood* v. *Sutcliffe*, 8 Eng. Law and Eq. Rep. 221: "Everyone knows that whenever human beings congregate in great numbers on the banks of a stream, irrespective of all manufactures, it has the effect of polluting and altering the character of the stream. It is an inevitable consequence and no vigilance can prevent it."

Or as said by our own Court in 59 Md. 108, referring to *Wood* v. *Sutcliffe:* "All running streams are to certain extent polluted and expressly are they so when they flow through populous regions of country and the waters are used for mechanical and manufacturing purposes."

Hence should the appellants and the other alleged polluters be enjoined, it would still be impossible to secure the water of the purity and character as desired and required by the appellees. The case is wholly unlike *Woodyear* v. *Schaefer*, 57 Md. 1.

There is no equity in the claim of the appellees against the appellants, and if the alleged sewage discharged from the buildings of the grantees of the appellant company were discontinued no relief whatsoever would be experienced by the appellees. The meagre supply of water in question would come down to their lake wholly unfit for the domestic uses to which long years ago, and before the neighborhood filled up, it was to some extent capable of being put.

The Court cannot be insensible of the consequences to the respective parties of the injunction in question. The large expenditure of money made by the appellants in the development of their property, carried on under the very eyes of the appellees, without any suggestion of any objection or any notice of injury to the appellees, should be considered and the appellees should be left to their remedy at law. Acquiescence and laches may well be availed of by the appellants as a complete answer to the extreme and rigorous contention of the appellees.

*D. G. McIntosh*, for the appellee.

That a great deal of foul matter has been negligently suf-

fered to escape into the stream by others than the defendants may be true, but that furnishes no justification for defendants contributing to the nuisance, and that they did so contribute is not only a matter of admission, but the proof shows that the nuisance was most disgusting and pronounced where the contents of the water closets from defendants' premises were poured into the stream.

It is also claimed that one of the small tributaries to the lake having its source on complainants' premises, has a hog pen near it, and testimony was offered by defendants to show that upon analysis, this water was foul before it connected with the larger tributary emptying into the lake. The run is protected by a stone wall between it and the hog pen, and the flow from it is small, the bed of the stream being frequently dry. The chemist, Glaser, pronounced the water which he took from this run to be slightly flocculent and without odor.

The defendants also claim that complainant had knowledge of the improvements undertaken by them and stood by without objection, and the defendants having gone to large expense, the complainants are now estopped from raising objections. As a matter of fact, Dr. Hill states, that "many years ago, as soon as I found that a sewage system was being adopted, which naturally flowed into one of the sources of supply for the Mount Hope lake, I notified the company informally that we would have to make formal complaint unless it was stopped, because it would inevitably contaminate our water supply. No action being taken I formally requested the health officer of the county, who was then Dr. Stevenson, to examine the premises and take such steps as would correct the evil. He went over the place, surveyed the water supply and served a formal notice on the company. No action having been taken I called the attention of the State Health Officer, Dr. Fulton, to the matter. He went over the premises and suggested that the attention of the county officer be again called to the matter. I had Dr. Paine, who was then, and is now, the County Health Officer, to examine the premises, and his conclusion was that no action could be taken

until some one died from the injury. Since that time one patient has died from this cause, but the matter has not been officially brought to his attention.''

The defendants also claim that the neighborhood and its growing surroundings and the increase of inhabitants preclude the possibility of complainants getting pure water as it formerly did, and that this forms a justification for the nuisance committed by defendants. Were all the matters suggested in these several defenses conceded to be true, they would furnish no justification to defendant. *Woodyear* v. *Schaeffer*, 57 Md. 91; *Susquehanna Fertilizer Co.* v. *Malone*, 73 Md. 282.

"Where a person leads into the waters of a running stream any noxious or offensive matter that renders the waters essentially unfit for domestic use, it is regarded as a nuisance.'' *Addison on Torts*, vol. 1, sec. 218; *Potter* v. *Fremont*, 47 Cal. 165; *Miller* v. *Marshall*, 5 Mur. (Sc) 28; *Goldsmith* v. *Tunbridge*, *Wells Impt. Co.*, 1 L. R. Ch. App. 349; *Vedder* v. *Vedder*, 1 Denio, N. Y. 257. "Every occupier is bound to prevent the filth from his drains or cesspools from filtering through the ground into his neighbor's house or land. It is a charge or duty laid on him of common right for neglect of which he is answerable.'' *Addison on Torts*, sec. 218.

The case at bar falls within that class to which the maxim "*Sic utere tuo ut alienum non laedas*" is applicable. If filth is created on any man's land, then in the quaint language of the report in Salk, 361 : "He whose dirt it is must keep it that it may not trespass.'' *Hodgkinson* v. *Ennor*, 4 Best. & Smith, 116.

The principle under discussion is not confined to the pollution of living steams. *Pearce* v. *Gibson City*, 55 L. R. A. 477.

The contention of defendants that the stream in plaintiff's premises and flowing into the lake is so bad that it is of itself sufficient to pollute the lake and render it wholly unfit for drinking or other domestic use, and that thereby the defendants are excused from any pollution caused by them, no matter how gross, is untenable and unsupported by the evidence. The especially obnoxious feature of the contamination

complained of is that from human excreta and urine, which is essentially different from that of hogs.   Typhoid germs are not found in or conveyed by the latter.   The stream is protected from the hog pen, charged by defendants with causing the trouble, by a stone wall.   It is dry a large portion of the year, and when examined by the witness, Rossiter, in November, 1901, there was no discharge from it at all into the lake, and at the same time witness discovered masses of slime and excrement where the pipes from defendants' premises run to the stream.

BOYD, J., delivered the opinion of the Court.

A bill in equity was filed by the appellees against the appellants asking for an injunction to restrain them "from polluting and contaminating the water flowing into the lake of your orators, and especially forbiding the use by the West Arlington Improvement Company of the pipes laid by them for the discharge of sewage matter from adjoining houses, or any houses, into the sources of the stream flowing into complainant's lake, and from laying further pipes for the discharge of sewage in the same manner and from doing anything the direct result of which will be the necessary contamination of the water so flowing into complainant's lake," etc.   The bill also prays that the individual defendants be restrained from discharging sewage and water closet contents, or other foul and offensive matter, from their respective houses into the stream supplying complainant's lake, or into the sources of said stream, or in such manner that they are directly emptied into it.   A preliminary injunction was granted and, after hearing, a decree was passed making the injunction perpetual. From that decree this appeal was taken.

It is alleged in the bill and admitted by the answer that the Sisters of Charity of St. Joseph, a religious association formed for the purpose of carrying on works of piety, charity and usefulness, and especially for the care of the sick, the succor of the aged, infirm and necessitous persons, were incorporated by chapter 95 of the Acts of the General Assembly of Mary-

land, for the year 1816.   They acquired tracts of land by three deeds, dated in 1856, 1858 and 1873 respectively, and by the Act of 1870, chapter 65, certain Sisters of Charity were incorporated under the name and style of Mount Hope Retreat in Baltimore County, and thereupon the possession of all the lands referred to and the management, supervision and control of the same, together with the hospital building and appurtenances thereunto belonging, were turned over to the Sisters of Charity so incorporated, and the care of the sick and afflicted being treated therein confided to them.   It is alleged that there was, when the complainants first became possessed of the premises, "a stream of water of good and wholesome character running through said grounds westerly of the hospital buildings, and some distance therefrom, the sources of which are chiefly beyond the limits of complainant's grounds, and which flows through land now owned by the West Arlington Improvement Company."   It is contended on the part of the appellants that there was not a living stream of water running through the lands of the Improvement Company when it purchased them and laid them out into streets, avenues, lots, etc., but the evidence abundantly shows that there was such stream and Mr. Rossiter, the farmer of the appellees, testified: "It is sufficient to supply the demands of the institution for all purposes at all times in the year."   It is not necessary to refer to other testimony on that subject, as we are convinced that it is a well established fact in the case.   In 1881 and 1882 the appellees constructed a lake in and along the bed of the stream, so as to accumulate water and by means of a steam pump and pipes conveyed it to the hospital buildings.   About 1895 a larger pump was placed there and the cisterns into which the water is pumped have a considerable capacity.   Mr. Rossiter said: "When the lake was first constructed, to all appearances and to our knowledge, the stream was pure; that is as pure as any ordinary stream would be in the country," and that "Its condition has been for the last two years or more filthy; there is a visible sewage, that is (dis) charged from the West Arlington property into this

stream." That testimony is in substance sustained by other witnesses. The West Arlington Company has laid in some of its streets terra cotta pipes from eight to twenty-four inches in diameter, and there is a system of sewers and open drains which conduct the sewage and other things coming from the houses with which they are connected into this stream, and much of them eventually gets into the lake. The secretary of the Arlington Company says the sewers "were constructed to carry off the water and closet stuff." The water taken from the lake is contaminated by sewage, although the appellants deny that they are responsible for its condition, as we will see in the discussion of the defenses made by them. There are between six and seven hundred inmates of the hospital—many of them insane—besides about one hundred employees of different kinds. The appellants deny that the appellees are entitled to the aid of a Court of equity, and assign a number of reasons for their position.

1. It is contended that the appellees have not come into Court with clean hands. In the first place it is said that they had no right to make a lake on the stream and divert the water. It is not denied that they have the rights of a riparian owner. As such they unquestionably have the right to make such use of the water as belongs to one who owns the land through which such a stream runs. The general rule is that each of the riparian proprietors is entitled to a reasonable use of the water for domestic, agricultural and manufacturing purposes, and what is reasonable with respect to the rights of others must depend upon circumstances, such as the character and size of the stream and the uses to which it can be applied. One of the common uses of a stream which is not navigable, is to detain and obstruct its flow with dams in order to utilize the water power, and hence it cannot be said that building a lake in a stream is necessarily interfering with the rights of others. Each case must largely depend upon its own peculiar facts, so far as the quantity that can be taken is concerned, and here there is not only a total absence of evidence to show that any one is injured by the use the appellees

make of this water, but, although this plan has been in operation for about twenty years, there is not a suggestion of complaint from any one. For aught that appears the appellees may have acquired from the lower riparian proprietors all rights they had, or the latter may be perfectly satisfied with such diversion of water as there is. So without deeming it necessary to determine to what extent an institution of this kind can use water out of a stream running through its lands, for the purposes for which this is' used, there is nothing in the record from which we could say that it is being used in such way as to make it so inequitable on the part of the appellees as to deny them any relief against an upper riparian owner that they would otherwise be entitled to.

2. Then it is said that the appellees pollute the water thus taken to their hospital, and then eventually turn it upon others in that polluted condition. What we have just said applies with equal force to this contention. The sewage from the hospital is emptied into another stream which eventually reaches Gwynn's Falls. There is nothing to show the character of that stream, after it leaves the Mount Hope property, how it is used, if at all, by others, or whether the pollution from Mount Hope does in fact injure it, or any person, or whether the rights of any riparian owners that ever did exist have been acquired by the appellees. In both of those contentions it would unquestionably be incumbent upon the appellants to establish what the facts really were before they could ask a Court of equity to deny the appellees the relief here sought on the ground that they were acting in an inequitable way toward others. There certainly would have to be more than there is in this record shown by them to justify us in determining the conduct of the appellees to be so inequitable as to deprive them of the aid of a Court of equity. It might as well be said that A could not enjoin B for destroying his property, if other proper grounds were shown, because A was probably or possibly destroying that of C. We are not aware of any authority that would go to that extent.

3. Another ground relied on for this defense is that the ev-

idence shows that what is spoken of as "hog pen run," which empties into this stream above the lake, is polluted by the hogs of the appellees.   If the pollution was of the same character as that complained of, there might be some reason for questioning the right of the appellees to the relief sought.   If, for example, the sewage from the hospital was emptied into this stream above the lake, it would be asking a great deal of a Court of equity to enjoin the appellants when the appellees were doing the same thing they were complaining of.   In short they would then be contributing to the very wrong they seek to hold the appellants responsible for.   They are not, however, complaining of pollution by the appellants from hog pens, but from what is far worse.   The testimony is very conflicting as to the pollution from this run.   The expert on the part of the appellants condemned it as very dangerous, while the one offered by the appellees said, "This is fairly good water ; this is potable water, but would not advise to use it domestically without boiling it, it measures very nearly to the city water ; in no cases it approaches the limits which would compel me to call it bad water."   But conceding that there was some pollution from that stream it is as we have said not only not of the character that was being complained of—emptying the excrement and urine of human beings from which such diseases as typhoid fever may be contracted—but Dr. Hill, the physician in charge of the hospital said, "The hog pen run, as termed, there is such a small tributary to the lake we did not consider it of any importance, we never suspected any contamination from that source.  If we had suspected anything, we would have had the hog pen removed long ago. As analysis shows some effect we will see that there shall no longer be any trouble, we will have it attended to."   The evidence differs as to the distance the hog pen is from the stream—one witness said about fifty feet, another about twenty feet—but a stone wall was built there by the appellees for the purpose of protecting the stream and it is perfectly apparent that they were not aware of any contamination from that source, and now when their attention is called to it they pro-

pose to remove it.   If the condition of the water complained of could be attributed to this or any other act of the appellees, there would be some foundation for the defense based on that, but no one can read this record and suppose for a moment that the hog pen was in any wise responsible for the horrible condition of the water described by the witnesses, as at most it only furnished another source of pollution, altogether different from that complained of, both in kind and degree.   As the appellees were ignorant of any pollution or danger from that source, and as its removal will not in any degree relieve them of the conditions for which they seek to hold the appellants responsible, it would be carrying the maxim of coming into a Court of equity with clean hands further than is either necessary or proper, if they were denied relief on account of the hog pen.   All streams are liable to be more or less polluted.   As we said in *Helfrich* v. *Catonsville Water Co.*, 74 Md. 276, "The washings from cultivated fields might, and probably would, carry soil and manure into streams of water, and make them muddy and impure.   And so the habits of cattle according to their natural instincts, would lead them to stand in the water and befoul the stream. But nevertheless the owner of the land must not lose the beneficial use of it.   The inconveniences, which arise from the pollution of the water by these causes, must be borne by those who suffer from them."   Would a farmer, who was thus permitting the pollution of a stream, be denied relief against those who were emptying sewage and other such foul matter into a stream merely because he was responsible for such pollution, although of altogther a different character from that complained of?   We do not think that under the circumstances of this case the plaintiffs are precluded from obtaining relief on account of such pollution, as has been shown to exist, either on hog pen run or the other small tributary which has its source on their land.

4. Without deeming it necessary to state the evidence in detail, we are satisfied that it establishes the fact that the appellants were materially contributing to the pollution of the

stream in a manner calculated to do serious injury to the inmates' of this institution and to materially injury the appellees. Cases of this character sometimes present conditions that cause Courts to seek some solution that will enable them to grant relief to the complainants, and at the same time not require the other parties to sacrifice all they have invested in the properties owned or controlled by them. As this country has become more thickly settled, as manufactories have been established, and water has been introduced into residences and other buildings for purposes that were unknown years ago, the problem of protecting running streams and at the same time permitting industries to be carried on and of having proper drainage has become a serious one. This improvement company has expended large sums of money for the development and drainage of its property, and it is to be regretted if the location be such that no method of drainage can be reasonably adopted which will not affect the rights of others, but if we are to be governed by legal principles that are thoroughly and clearly established, in this State as well as elsewhere, there can be no doubt that the facts proven admit of but one conclusion to be reached. The case of *Woodyear* v. *Schaefer*, 57 Md. 1, answers most if not all the contentions of the appellants. The right of the owner of a flour mill to enjoin the owner of a slaughter house from emptying into a stream blood, offal, and other matter from slaughtered animals was there fully sustained. In the case of *Baltimore* v. *Warren Manufacturing Co.*, 59 Md. 96, this Court, through JUDGE ALVEY, after saying that the statement that each riparian owner had the right to have the water of a natural stream flow through his land in its natural purity must be understood in a comparative sense, added, "But any use that materially fouls and adulterates the water, or the deposit or discharge therein of any filthy or noxious substance, that so far affects the water as to impair its value for the ordinary purposes of life, will be deemed a violation of the rights of the lower riparian proprietor, and for which he will be entitled to redress. Anything that renders the water less wholesome than when in its ordinary natural

state, or which renders it offensive to taste or smell, or that is naturally calculated to excite disgust in those using the water for the ordinary purposes of life, will constitute a nuisance, and for the restraint of which a Court of equity will interpose." When then it is shown that the appellants not only empty into this stream substances which are offensive to taste and smell, but such as are liable to produce disease, can a Court of equity hesitate to grant relief merely because the offenders may be subjected to loss or inconvenience ?   If Courts are to enforce rights and redress wrongs, impartially, there can be but one answer to that question.   Although it may not be necessary to cite other authorities, the case of *Barrett* v. *Cemetery Association*, 159 Ill. 385, is very much in point, and the notes to it, as reported in 3 *Am. & Eng. Dec. in Equity*, 647, etc., refer to many authorities.

5. The fact that other parties have been contributing to the nuisance complained of is no excuse.   As was said in *Woodyear* v. *Schaefer*, "It is no answer to a complaint of nuisance that a great many others are committing similar acts of nuisance upon the stream.   Each and every one is liable to a separate action, and to be restrained."   In that case the defendant apparently contributed in a very small degree to the nuisance, while in this there can be no doubt the appellants are largely responsible for the present condition of the water, although others have contributed to the same character of pollution.   In *Barrett* v. *Cemetery Association, supra*, it was attempted to show that the waters were already polluted, but the Court said, "We know of no rule of law that sanctions one wrong because another has preceded it."   And again it was there said "the mere fact that in the case at bar the waters of this stream may have, to some extent, been rendered unwholesome when flooded by the washings from manured lands, or by the connections of other drains, is no excuse for the threatened pollution by the cemetery companies."

6. Nor can the appellants successfully rely upon the alleged laches of the appellees.   There is some evidence tending to show that the officers of the Improvement Company were

warned against emptying these drains into this stream, but whether that be so or not it is not pretended that the appellees ever did anything to induce the appellants to proceed with their improvements. The officers of the company probably knew, and certainly by a little investigation could have ascertained, that the appellees were using this stream for the purposes they now use it, when the company commenced its improvements. They are presumed to have known what rights in the stream the law gives riparian owners, and why should the appellees be denied relief merely because they were not hasty in seeking a remedy from the Courts. In *Woodyear* v. *Schaefer*, the pollution of the stream had been going on for some years—gave "trouble of material importance" about eight years before it was sought to be enjoined, after which time it gradually grew worse. As the Court there said "It was natural for the complainant to bear evil as long as it was slight, rather than engage in a tedious and expensive litigation," and in this case it was not until the appellees became convinced that typhoid fever had been contracted by some of the inmates of the institution from the condition of the water that they sought the aid of the law. They should not be denied relief because they delayed as long as they believed it to be safe to those in their care, before resorting to extreme measures.

So although it is to be hoped that some means can be adopted by the parties which will not only protect the appellees but will avoid material injury and great inconveniences to the appellants, there is nothing left for us, under the law and the facts proven in this case, but to affirm the decree below, whatever the consequences to the appellants may be.

*Decree affirmed, appellants to pay the costs.*

(Decided April 2nd, 1903.)