## JOHN NEUBAUER et al.

### vs.

## THE OVERLEA REALTY COMPANY.

*Pollution of Stream—Suburban Development—Emptying
Sewage on Land—Injunction.*

The owner of land through which a natural stream flows is
entitled to an injunction to restrain the pollution of the stream.
p. 95

The owner of a truck farm, through which a stream flowed,
*held* to be entitled to restrain the pollution of the stream by
the emptying therein of sewage, from sinks and cesspools
belonging to houses erected on a neighboring suburban devel-
opment, to such an extent as to prevent the use of the water
for domestic and other purposes, as was previously done.
pp. 94-100

That the stream in question was to some extent polluted
before it received the sewage complained of, and that by reason
of such pollution the water was not fit, and was never used, for
human consumption, did not justify the discharge therein of
the sewage.                                          p. 96

The collection of drainage and sewage, and the emptying
thereof on another's land in such a way as to cut a deep ditch
therein, is an unlawful act of which the other may complain.
p. 99

To a bill to enjoin a suburban development company from
discharging sewage into a stream running through plaintiff's
land, by means of street pipes connecting with the houses, it is
no defense that the company no longer owns the houses, it
still owning the beds of the streets and the pipes therein, and
it proposing to introduce the same system of drainage and
sewerage for the other streets.                        p. 99

*Decided January 9th, 1923.*

Appeal from the Circuit Court for Baltimore County, In
Equity (PRESTON, J.).

Bill by John Neubauer and Catherine Neubauer against The Overlea Realty Company for an injunction. From a decree for defendant, plaintiffs appeal. Reversed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Edward H. Burke,* with whom was *Isador Goldstrom* on the brief, for the appellants.

*Elmer J. Cook,* with whom were *Samuel K. Smith* and *Ernest W. Beatty* on the brief, for the appellee.

THOMAS, J., delivered the opinion of the Court.

The appellants, John Neubauer and Catherine Neubauer, his wife, plaintiffs in the court below, are the owners of a tract of land in Baltimore County, near the Baltimore City line, containing about twenty and one-half acres. Mr. Neubauer was a trucker, and he and his wife purchased the property in 1888 for the purpose of establishing a truck farm, and have lived there ever since. The property is improved by a large dwelling house, in which the appellants and their family live, a barn, granary, hay barrack and other farm buildings, and the land is cultivated by the appellants and their four daughters and two sons. Mr. Neubauer also owns two stalls in Lexington Market, Baltimore, and the vegetables, &c., raised on the farm are hauled to and sold at these stalls.

The farm is nearly rectangular in shape, and is about 2,300 feet long from north to south, about 450 feet wide at the south end, and about 335 feet wide at the north end. There is a natural stream on the property which originates at a point some distance from the northwest of the farm. It enters the appellants' land a short distance south of the northwest corner of the farm, and flows through the farm in a southeasterly direction, and thence through adjoining lands to Herring Run, which empties into Back River. A small meadow or part of the land through which the stream runs is

enclosed and used by the appellants as a pasture for their horses and cows. There is another and smaller natural stream on the property, which starts from springs on the adjoining land of the appellee hereinafter referred to, and enters the appellants' land at a point some distance south of the entrance of the other stream. This stream flows through the appellants' land for several hundred feet and empties into the larger stream at a point south of the appellants' farm.

In 1913, Henry Kolb, the president and general manager of The Overlea Realty Company, the appellee, conveyed to that company a tract of land, part of which is in Baltimore City and a part in Baltimore County, containing about forty acres, and lying between the Bel Air Road on the west and the appellants' land on the east. The property, according to the plat offered in evidence and made a part of the record, is divided into streets or avenues, alleys and building lots. The principal streets run from Bel Air Road in an easterly direction to an unimproved street called on the plat Woodland Avenue. Woodland Avenue, as indicated on the plat, runs north and south, and adjoins the land of the appellants throughout the entire length of their farm. The larger stream to which we have referred crosses Kenwood Avenue, the northern boundary of the appellee's tract, and the northeast corner of the appellee's property to Woodland Avenue, and then runs down Woodland Avenue for a short distance to a point between Kolb Avenue and Belmar Avenue (the first streets south of Kenwood Avenue), where it enters the appellants' property.

The settlement on the property of the appellee is known as Belmar and, according to the plan of development adopted by the appellee, the appellee constructs the streets, builds the houses, installs the drainage and sewerage system, and then sells the houses. The appellee also established a water plant, but the water is now furnished by Baltimore City, and the appellee pays for it "by meter." Each house is equipped by the appellee with kitchen sinks, bathtubs, water closets, and a cesspool or septic tank constructed under the front porch.

the septic tank consists of an airtight and watertight concrete pit, about eight feet long, four feet wide and four feet deep, with a partition in the middle, and the two apartments connected by a pipe through the partition, with a four-inch ell on one side and a four-inch T on the other side of the partition.    One end of the tank is connected with the water closet in the house, and the other end is filled with broken stone.

From a point about 1,600 feet west of Woodland Avenue the land of the appellee slopes towards Woodland Avenue and the farm of the appellants, and, in constructing the drainage and sewerage system, the appellee laid a terra cotta pipe, twelve inches in diameter, in the bed of Kolb Avenue, about two feet below the surface of the street, and a pipe fifteen inches in diameter in the bed of Belmar Avenue.    As we understand the evidence, the pipe on Kolb Avenue extends from the intersection of Mannington Avenue, which runs north and south and is about 600 feet west of Woodland Avenue, to the larger stream referred to where it flows on Woodland Avenue, and the pipe on Belmar Avenue extends from the intersection of Mannington Avenue to and across Woodland Avenue to the appellants' land.    At the intersection of Kolb and Mannington Avenues, and the intersection of Belmar and Mannington Avenues, the appellee constructed inlets to the pipes laid in the beds of Kolb and Belmar Avenues, so that all the drainage in the gutters on Kolb and Belmar Avenues west of Mannington Avenue, for the distance of about 1,000 feet, flows into those pipes.    The sewage from the kitchen sinks and bath tubs, and the overflow from the cesspools or tanks of the houses on Kolb and Belmar Avenues, are emptied, according to the elevation of the lot, either into the open gutters or the terra cotta pipes on those streets.    All of the lots on Kolb Avenue and Belmar Avenue have been improved and the houses and lots sold by the appellee, and by the drainage and sewerage system so constructed and maintained by the appellee the sewage from about forty of those houses, including the overflow from the septic tanks, is emp-

tied into the stream referred to as the larger stream, which flows through the appellants' farm. The sewage on Kolb Avenue enters the stream at Woodland Avenue, and that on Belmar Avenue is carried across Woodland Avenue and emptied on the appellants' land, and then flows over the appellants' land for the distance of about eighty feet to said stream.

The appellee has about four hundred more lots in Belmar on which it proposes to build about two hundred houses, and at the time of the trial in the court below had under construction five houses on Cherry Avenue, the next street south of Belmar Avenue. The president of the appellee testified that in the further development of the company's property the appellee intended to adopt the same drainage and sewerage system, and to empty the drainage and sewage from the houses on Cherry Avenue and the other streets south of Cherry Avenue into the other or smaller stream mentioned, which enters the appellants' land at the intersection of Forest View Avenue and Woodland Avenue and, as we have said, flows through their property for several hundred feet and empties into the larger stream at a point south of their farm.

The erection of the houses and construction of the drainage and sewerage system referred to was begun by the appellee several years before the trial of the case in the court below, and, before their completion, the appellants, fearing that the sewerage system proposed would injure their property, protested against the same to the appellee, and in December, 1919, brought suit against the appellee in the Circuit Court for Baltimore County for the damage already done. In October, 1921, the bill of complaint in this case was filed in said court, setting out the facts to which we have referred, and alleging that, by reason of the emptying of the drainage and sewage mentioned into the larger stream referred to, the water in that stream had become polluted and discolored by vegetable and animal matter from the kitchen sinks, bath rooms and cesspools or tanks on Kolb and Belmar Avenues; that the water is covered by "an obnoxious green scum"; that the banks of the stream are marked by other deposits of an ob-

noxious nature; that the stream gives off a most foul and disagreeable odor at all times, and especially in periods of dry weather, and that the water of the stream is "no longer fit for consumption by the horses and cows" of the appellants.

The bill further alleges that the appellee was engaged in the further development of its said property, in the erection of houses on Cherry Avenue, and in installing the same system of drainage and "sewerage disposal"; that said system "will centralize and flood" on the appellants' land all of the drainage and sewage from Cherry Avenue and other avenues, and will result in cutting deep ditches on the appellants' property, and that said acts of the appellee amount to a "practical taking of your orator's property for the benefit of said defendant." The prayer of the bill is for an injunction restraining the appellee from disposing of the "waste and drainage waters flowing from" the pipes on Kolb and Belmar Avenues so as to injure and destroy the property of the appellants, "or pollute the stream running through their property," and also restraining it "from constructing any other sewerage or drainage system" in the further development of its property known as Belmar, so as to pollute the stream flowing through, or "damage" or "injure" the property of the appellants, and for general relief.

The court below passed an order requiring the appellee to show cause why the injunction should not be issued as prayed, and in its answer to the bill the appellee alleges that the larger stream mentioned has its origin about one-half of a mile north of the appellants' property and flows in a southeasterly direction through a development called Overlea and then through the property of the appellee, for the distance of about one hundred feet, to the property of the appellants; that said stream flows through a natural valley and is "the natural means of drainage for a large portion of Overlea" and other developments, as well as the land of the appellee, and that "there are now and have been for more than twenty years houses upon said tracts of land the drainage from which flows directly into said stream"; that at the time of the filing of

said answer there were "upon the land which drains into said
stream" north of the appellants' property more than one hun-
dred and twenty-five dwellings, "all of the drainage from
which runs directly into said stream before it enters the prop-
erty of the appellee; that none of said dwellings is equipped
with "underground drainage pipes or cesspools" or has "any
means of purifying" the "waste matter" before it enters the
stream; that said stream is therefore polluted before it enters
the property of the appellee, and that the "waste matter" from
the dwellings on the appellee's property "could not possibly
further pollute the water of the stream"; that while the
appellee is constructing five houses on Cherry Avenue, it is
also "engaged in constructing a pipe" across its property to
Forest View Avenue so that it will discharge "into another
stream running through Belmar"; that because of the "low
situation of the land" of the appellants, the first mentioned
stream "is the natural drain" for the appellee's property, and
the appellee has not polluted said stream" to any greater ex-
tent than it is already polluted before entering" the property
of the appellants"; that the said pipe on Kolb Avenue does
now and the said proposed pipe in Woodland Avenue will
discharge their contents directly into streams on the land
known as Belmar: and that the only possible damage to said
complainants is caused by the flowing of the contents of the
pipe at the foot of Belmar Avenue across the property of the
complainants for a short distance, which this respondent is
ready and willing to correct by laying an underground terra
cotta (pipe) from the mouth of said pipe at Belmar and
Woodland Avenues to the said stream."

In addition to what we have already stated, the evidence
shows that the larger stream mentioned, before it enters Bel-
mar, the property of the appellee, flows through a section in
which there are a number of dwelling houses, and that, by
reason of the contour of the land, the surface drainage of
that section flows into that stream; that there is no general
water supply in that section and no drainage system; that the
residents thereof have outside privies, with concrete pitts or

boxes, and that, generally speaking, these pitts or boxes are from time to time cleaned and the contents hauled away. It is clearly established by a number of witnesses that while the water in this stream has never been used for human consumption, it was, prior to the construction by the appellee of the drainage and sewerage system complained of, always clear and free from any offensive odor, and was used by residents of the neighborhood for other domestic purposes and for watering their horses and cattle; that immediately north of the point where the stream receives the flow from the appellee's drainage and sewerage pipes, the stream is still clear and free from offensive odors; that since the construction of the sewerage system referred to the bed of the stream, below the point where such sewage flows into it, is covered by a dark deposit or sediment, the water is discolored and dirty, has the odor of water closets or night soil, and cannot be used for any domestic purpose or for watering horses and cattle; that the water has a "scum on it," and during a dry season the odor from the stream becomes very offensive to the appellants and their family while engaged in cultivating their land, and frequently extends to their residence some distance away. The evidence also shows that the sewage from Belmar Avenue, which flows, as we have said, across the appellants' farm for the distance of about eighty feet before it reaches the stream, has cut a deep ditch in their land; that the water of the smaller stream into which the appellee intends to empty the drainage and sewage from Cherry Avenue and other streets south of Belmar Avenue was, at the time of the trial, clear and fresh, and that the construction of the proposed system of drainage and sewerage will not only pollute that stream but will also result in cutting another ditch or other ditches on the appellants' land.

The learned court below took the view that the use that the appellee had made of the larger stream was a reasonable one, and that as the appellee represented that the flow of the drainage and sewage from Belmar Avenue across the appellants' land would be remedied at once, the relief prayed should be

denied, and the present appeal is from its decree dismissing the appellants' bill.

The contentions of the appellee are (1) that inasmuch as the contour of the land is such that the natural flow of surface water on the land of the appellee is towards the larger stream mentioned, and inasmuch as that stream is polluted by the drainage of the section through which it passes before it reaches Belmar, the emptying of the drainage and sewage from the houses in Belmar into said stream is a reasonable and lawful use of the stream by the appellee, and (2) that the appellee does not now own the houses or septic tanks on Kolb and Belmar Avenues, and does not own the bed of said streets, and is therefore powerless to remedy the condition complained of.

In support of the first proposition the appellee relies upon the case of *Fahnestock* v. *Feldner,* 98 Md. 335. A careful reading of that case, however, will show that it does not sustain that view. There the bill was filed to enjoin the obstruction of the flow of a natural stream through the lands of the several defendants in Baltimore City, which resulted in forcing the water back on the plaintiff's land until it covered about three-quarters of an acre, thereby rendering the land valueless and causing a nuisance. The stream began about one hundred and fifty feet east of the east line of Madison Avenue and flowed in an easterly direction through the heart of the city over the land of the plaintiffs, for the distance of about fourteen hundred feet, and then over the land of the defendants to Mt. Royal Avenue, and then under the bed of Mt. Royal Avenue to Jones' Falls, and most of the defendants, in grading their respective lots, had buried the stream from forty to fifty feet under the surface of their lots. One of the numerous defenses made was that the plaintiffs themselves polluted or permitted the stream to be polluted by sewage, and they were not therefore entitled to any relief in a court of equity. In disposing of that defense the Court said: 'We find no satisfactory evidence in the record that the plaintiffs have caused or permitted the privy wells or water closets to be

drained in the stream * * *. There is some testimony tending to show that closet and privy drains were carried into the stream. But if there was any such pollution of the stream from the source last named there is no convincing evidence that it was caused by the plaintiffs. We think, therefore, it may be assumed that whatever pollution of the stream existed, if any, on the part of the plaintiffs, was such as resulted from the ordinary house and kitchen drain." After referring to the locality of the stream, the fact that for more than twenty years the house drainage from Madison Avenue and other streets had been carried into the stream, and that the water had never been used for any domestic purpose, the Court held that the use of the stream by the plaintiffs as a drain for house drainage, as distinguished from sewage from water closets, was not such an unlawful use of the stream as disentitled them to relief in a court of equity. In the case at bar it is not pretended that the appellants have polluted the stream or done anything to disentitle them to relief in equity, and the evidence shows that by reason of the pollution of the stream by the appellee the water can no longer be used for the domestic and other purposes for which it was used by the appellants and others for more than twenty years prior to such pollution. The fact that the stream is to some extent polluted by others before it enters Belmar and receives the sewage from Kolb and Belmar Avenues, and the further fact that by reason thereof the water is not fit, and was never used, for human consumption, affords no justification for the acts of the appellee, and the case comes within the principle clearly stated in *Woodyear* v. *Schaefer*, 57 Md. 1, and followed in all the latter decisions of this Court. In *Woodyear* v. *Schaefer*, *supra*, the plaintiff was the owner of a flour mill, in Baltimore City, on Gwynn's Falls, below its junction with a small stream called Gwynn's Run, and the defendant was a butcher, having a slaughter-house on Gwynn's Run, in Baltimore County, about a mile above the plaintiff's mill. The plaintiff's bill for an injunction alleged that the defendant emptied or allowed to flow into said run the blood, entrails and other

offal from slaughtered animals, and that this blood and offal, by the flow of the stream, made its way into the plaintiff's mill dam, and from the dam into the mill race, whereby the water in the race was mixed with and covered by said animal matter, which caused and created a nuisance, and that the animal matter decomposed and created an offensive smell, which, at times, was unbearable. The answer of the defendant denied that any offensive matter was thrown into the stream, and alleged that the only matter allowed to flow into the stream from his premises was about fifteen buckets of beef blood per week, which could not be seen in the run over one hundred yards below the slaughter-house, and could not cause any offensive deposit, create a nuisance or injure the plaintiff; "that on Gwynn's Falls and the run there are a large number of slaughter-houses and other establishments, which (some for over thirty years, and nearly all for over twenty years), have used these streams as sewer-ways, and that the blood from all these slaughter-houses, and the refuse from breweries, soap and other factories, have flowed into these streams, for all this period of time, without complaint; * * * that the appellant's remedy is at law and not in equity; and that to grant him the relief prayed would be ruinous to a vast amount of property owned by butchers and others, and destructive to one of the most important branches of trade in the State, besides working a most grievous wrong to the" defendant. Referring to the evidence, the Court said that, while it established the offensive condition of the water in the run, mill dam and mill race, it showed that the principal contribution of the defendant ("in common with a large number of others") to the injury complained of was the blood that flowed from his slaughter-house in comparatively moderate quantities, and that the question to be decided was whether a court of equity could intervene to stop the defendant from committing the acts which constituted "such an inconsiderable part of the wrong complained of, and which, if stopped, would leave the appellant still suffering from almost as great a

grievance as he is now subject to." In answering that question and holding that the plaintiff was entitled to the injunction against the defendant, the Court said: "The right of a riparian owner to have the water of a stream come to him in its natural purity, or in the condition in which he has been in the habit of using it for the purposes of his domestic use or of his business, is as well recognized as the right to have it flow to his land in its usual quantity. *Wood on Nuis.,* sec. 677; *Gladfelter* v. *Walker,* 40 Md. 1, 13; *Wood* v. *Sutcliffe,* 2 Sim. N. S. 163; *Stockfort Waterworks Co.* v. *Potter,* 7 H. & N. 159. * * * It is no answer to a complaint of nuisance that a great many others are committing similar acts of nuisance upon the stream. Each and every one is liable to a separate action, and to be restrained. *Wood on Nuis.,* sec. 689; *Crosley* v. *Lightowler,* L. R. 3 Eq. 279; *Chipman* v. *Palmer,* 16 N. Y. 517." See also *Baltimore* v. *Warren Manfg. Co.,* 59 Md. 96, and *West Arlington Co* v. *Mount Hope,* 97 Md. 191. In *West Arlington Co. v. Mount Hope, supra,* this Court, speaking through the present CHIEF JUDGE, said: "This improvement company has expended large sums of money for the development and drainage of its property, and it is to be regretted if the location be such that no method of drainage can be reasonably adopted which will not affect the rights of others, but if we are to be governed by legal principles that are thoroughly and clearly established, in this State as well as elsewhere, there can be no doubt that the facts proven admit of but one conclusion to be reached. * * * The fact that other parties have been contributing to the nuisance complained of is no excuse." After quoting from *Woodyear* v. *Schaefer, supra,* JUDGE BOYD said further: "In that case the defendant apparently contributed to a very small degree to the nuisance, while in this there can be no doubt the appellants are largely responsible for the present condition of the water, although others have contributed the same character of pollution. In *Barrett* v. *Cemetery Association, supra* (159 Ill. 385), it was attempted to show that the waters were already polluted, but the court said: 'We know of no rule of law that sanctions

one wrong because another has preceded it.' And again it was there said 'the mere fact that in the case at bar the waters of this stream may have, to some extent, been rendered unwholesome when flooded by the washings from manured lands, or by the connections of other drains, is no excuse for the threatened pollution by the cemetery companies.' "

The collection of drainage and sewage and emptying it on the appellants' land, causing it to cut a deep ditch or ditches in their land, is also an unlawful act of which the appellants may justly complain. In 27 *R. C. L.* pp. 1151-1153, it is said: "It is the generally recognized rule both of the civil and the common law that a landowner cannot collect surface water into an artificial channel or volume, or precipitate it in greatly increased or unnatural quantites upon his neighbor, to the substantial injury of the latter. This is true although no more water is collected than would have naturally flowed upon the property in a diffused condition, for it is evident that, while a given piece of land may receive a large amount of surface water without injury thereto when it gently flows thereon from natural causes, yet when collected and discharged in considerable volume at a given point, it may become very distructive and injurious," and in the long list of cases cited in support of the text there are a number of Maryland cases.. The principle stated applies with greater force where, to the surface water collected, is added the drainage and sewage from a great number of houses. The appellee in its answer offers to carry the drainage and sewage from Belmar Avenue by an underground terra cotta pipe to the larger stream at a point on its own land. While the effect of such a change might be to prevent the cutting of a ditch on the appellants' land from the end of Belmar Avenue, no such offer is made in reference to the drainage and sewage from the streets south of Belmar Avenue.

In answer to the contention of the appellee that it no longer owns the houses and septic tanks on Kolb and Belmar Avenues, and does not own the bed of those streets, and is not therefore in a position to remedy the condition complained of,

it would seem only necessary to say that, while the deed to the appellee is not in the record, it is conceded that it purchased the tract of land called Belmar from Mr. Kolb, the president of the company, that it constructed and is maintaining the drainage and sewerage system in question, that in selling the houses and lots on Kolb and Belmar Avenues it did not sell or convey to the purchasers the bed of said streets, or the terra cotta pipes laid in the bed thereof, through which the drainage and sewage complained of flows directly or indirectly into the larger stream, and that in the further development of its said property it proposes to construct the same system of drainage and sewerage for the other streets, which will, as we have pointed out, result in further injury to the appellants' farm.

It follows from what has been said that the appellants are entitled to the relief prayed in their bill, and that the decree of the court below must, therefore, be reversed and cause remanded in order that an order or decree may be passed in accordance with this opinion, and it is to be hoped that the appellee can adopt some system of drainage and sewerage that will not only protect the appellants, but will also avoid any serious loss to the appellee.

> *Decree reversed, with costs, and cause remanded in order that an order or decree may be passed in accordance with the opinion of this Court.*