COUNTY COMMISSIONERS OF BALTIMORE COUNTY *v.* HUNTER ET UX

[No. 93, October Term, 1954.]

172

*Decided May 12, 1955*

174

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*George M. Berry, Deputy County Solicitor for Baltimore County,* and *Walter H. Haile, Assistant County Solicitor,* with whom were *Carroll W. Royston, County Solicitor,* and *James D. Nolan, Assistant County Solicitor,* on the brief, for the appellant.

*W Lee Harrison* and *Richard C. Murray,* with whom was *Michael Paul Smith* on the brief, for the appellees.

BRUNE C. J., delivered the opinion of the Court.

The appellant, the County Commissioners of Baltimore County (the "County") and the Fivak Corporation, filed a bill of complaint in the Circuit Court for Baltimore County, as upper landowners, to enjoin the appellees, Herbert T. Hunter and Johanna T. Hunter, his wife, as lower landowners, from obstructing an open drainage ditch. The appellees filed an answer denying the obstruction, and they also filed a cross-bill praying that the County and the Fivak Corporation be enjoined from the excessive discharge and channeling of water and debris on to the property of the appellees. The Circuit Court entered a decree dismissing the original bill of complaint and granting the relief requested in the cross-bill. The County appealed from this decree; Fivak Corporation did not.

The appellees are the fee simple owners of the property known as 12 Maple Avenue, Catonsville, Baltimore County, Maryland. Mr. Hunter has resided on the property since his marriage to Mrs. Hunter, who owned the

property since 1943. Mrs. Hunter, however, has lived on this property since 1940 and has been a lifelong resident in the immediate vicinity. The property fronts on the west side of Maple Avenue and extends westward to the east bank of a stream which is used by the County and others for storm drainage and sewage disposal. The northern boundary of the Hunter property in part runs along the southern or rear boundaries of properties owned by the Fivak Corporation and by the County. The County property also fronts on the Frederick Road. To the east of the County lot and between it and Maple Avenue are the Fitzpatrick and Farnandis lots.

The evidence showed that prior to 1926 there was a water course which carried storm water from a drainage area of approximately 45 acres on either side of Frederick Road, a state highway, along the south side in front of the swimming pool property now owned by the Fivak Corporation. At that time the water course was a deep ditch which ran along Frederick Road from a point west of Maple Avenue, at which there was located a box culvert, to a stream west of the swimming pool property which collected drainage and sewage. The evidence was not clear as to who had constructed the culvert, which runs beneath Frederick Road, but responsibility for its maintenance apparently rests upon the State Roads Commission.

In 1926 when the Five Oaks swimming pool was built the above mentioned water course was relocated and channeled in a new direction. It continued to enter the same stream, but at a different point. The relocated water course took a southwesterly direction from the box culvert located just west of Maple Avenue and flowed across what are now the Farnandis, Fitzpatrick, County, Fivak and, finally, Hunter properties. The testimony of Mrs. Hunter showed that (at least since the 1926 diversion) this has been the natural course of drainage into the stream which runs past the western boundaries of the Hunter and Fivak properties.

In 1930 the County built a pumping station on its lot which adjoins what is now the Fivak Corporation's

swimming pool property. Both a regular sanitary sewer and an overflow pipe from a manhole near the pumping station reach the stream to the west of the Fivak and Hunter properties without going through the Hunter property. It appears (though the evidence is not so clear as one might wish) that neither the regular sanitary sewer line nor the overflow pipe contributes to the damage to the Hunter property, of which the Hunters complain. They ascribe their troubles to the storm water drain; but the situation is somewhat complicated, because of there being some sewage matter which gets into the storm water drain and comes down through it onto the Hunter property. The source of such material is not established.

Until about 1950 there appears to have been little change in the surface water drainage or in the amount thereof. Mrs. Hunter described the water course prior to 1950 as a ditch "about 18 inches wide and about 12 inches deep," which ran across the rear of her property, and Mr. Hunter's testimony showed it to have been slightly wider on the County property but not so deep. Throughout the period from 1926 to 1950 the ditch carried storm waters from an area of 45 acres on either side of Frederick Road. These waters marged at or near the box culvert just west of Maple Avenue.

In 1950 the County made improvements on its pumping station property. It placed a 36-inch pipe in the ditch above described and extended this large pipe through the Fitzpatrick and Farnandis properties to the box culvert just west of Maple Avenue. Also, it constructed an open drain made of rock set in cement in the ditch beginning at the outlet of the 36-inch pipe at the edge of the County lot and extending approximately 60 feet over the Fivak property to the rear of the Hunter property, where it led into the ditch across the Hunter property which finally emptied into the sewage stream. In addition, the County built a road on its property and paved the rear of its lot, so what was formerly a marshy area could be used as a storage yard. There was also evidence that the County had covered over gutters on

either side of Frederick Road as more houses were built in the area, and that all of this water was carried into the big 36-inch pipe. These changes do not appear to have enlarged the drainage area from which storm water flowed over the Hunter property.

Prior to 1950, when the County made improvements, the Hunters had used the rear of their property as pasture for horses but after the installation of the 36-inch pipe by the County the Hunters said that they no longer could do so because the rear of their property became polluted and littered by glass, debris, and sewage matter, and this rendered it unfit for livestock. Mr. Hunter also testified that coincident with the installation of the underground drain pipes there was an increase in the volume of water and debris, and that the ditch across the rear of the Hunter property was increased in size by the washing away of soil from 18 inches by 12 inches to 5 or 6 feet in width by 5 feet in depth.

The Hunters erected two concrete posts on their property about 5 feet apart and installed a grating between them to prevent debris and other matter from flowing through the ditch onto their property. Debris collected in the ditch behind the grating and water became backed up on the Fivak and County properties. Also, some of the debris washed over the grating or around it onto the Hunter property and some soil was washed away.

Mr. Meinl, president of the Fivak Corporation, testified that his corporation purchased the swimming pool property in March, 1949, and that at some time thereafter the part of the parking lot through which the ditch flows was recindered. The wooden floor of the bath house near the parking area was replaced with a concrete floor. Mr. Meinl stated that there was a back flow of water from the ditch over the parking area.

There was also testimony that within the past five or six years before the trial the whole front of the swimming pool property along the Frederick Road had been paved with asphalt topping. Further testimony showed that the trolley tracks in the bed of the Frederick Road

had been regraded and that this has increased the flow of water over the Hunters' land.

The case was presented in the trial court and in this Court primarily as a controversy between upper and lower landowners with regard to the flow of surface water from one tract to or through the other. Running through the case, however, and almost inextricably intertwined with the controversy as presented, are questions which seem to be based not on the rights, duties or responsibilities of the County as a landowner, but as a municipal corporation, with regard to both storm water and sanitary sewers in the area.

Since we think it reasonably clear that neither the sanitary sewer, the pumping station or the overflow pipe contribute to the troubles of which the Hunters complain, we shall lay this particular phase of the case aside without further discussion.

The Hunters assert that after the installation of the large pipe and the paving of the open ditch leading from it to the edge of their property there was a marked increase in the flow of water. There is testimony from one of the County's witnesses which seems to support this claim, but he ascribed it to a number of unusually heavy rains.

The trial judge found that "The paving of the county's property has contributed to the additional flow of water on the property of the cross-complainant(s)." His opinion then went on to say: "The Court visited the property in company of counsel and carefully went over the situation. It appears to the Court that it is clear the condition complained of by the Hunters is largely attributable to the erection of new housing, the paving of the streets, the grading of the trolley tracks, and the grading and paving of the Fivak Corporation parking lot and the paving of the County's pumping station lot. The Court is of the opinion that the County in its efforts to furnish relief to the property owners above the Hunter property and in order to put its own pumping station lot in proper condition has been largely responsible for the conditions complained of and that the county authori-

ties should correct the condition which they have brought about. The Fivak Corporation has, however, made a contribution to the conditions complained of."

It will be noted that the Chancellor found that several things for which the County was clearly not directly responsible had contributed to the damage done to the Hunter property. These included the erection of new buildings, the grading of the trolley tracks and the grading and paving of the Fivak parking lot. Since the County was not responsible for any of these things, it could not be held liable for them in damages. *Kurrel v. City of Baltimore,* 113 Md. 63, 77 A. 373. The decree below, in practical effect, fastened financial responsibility on the County for the actions of others, not merely for its own. Whether an injunction should issue against the County on account of either of the other factors which the trial court found to be causes contributing to the erosion of the Hunters' land must next be considered. .Cf *Woodyear v. Schaefer,* 57 Md. 1, where an injunction issued to restrain even a minor participant in the creation of a nuisance from continuing to contribute to it.

How much, it at all, the County was responsible for the paving of streets in the area is not shown, nor does it seem material, since no intentional diversion of water or change in the drainage area is shown, and the County is therefore not liable. *Eisenstein v. City of Annapolis,* 177 Md. 222, 9 A. 2d 224.

We come next to the principal question in the case which is this: Did the installation of the pipe and the laying of the cemented drain leading from it to the Hunters' property violate their rights? The general rule which is well established in this State was recently restated by this Court in an opinion by Judge Hammond in *Hancock v. Stull,* 206 Md. 117, 119, 110 A. 2d 522, as follows: "The rule is that the owners of land are entitled to have surface waters flow naturally over the land of the lower landowner and the lower owner cannot obstruct the running of water from the higher land onto his own. *Whitman v. Forney,* 181 Md. 652. Pertinent qualifica-

tions are that the upper owner has no right to discharge water into an artificial channel, or in a different manner than the usual and ordinary natural course of drainage, or put upon the lower landowner water which would not have flowed there if the natural drainage conditions had not been disturbed. If water is unlawfully forced on the lower owner, he is entitled to protect his property from the unwarranted flow. *Biberman v. Funkhouser*, 190 Md. 424, 429."

In *Neubauer v. Overlea Realty Co.*, 142 Md. 87, 99, 120 A. 69, it was stated, "The collection of drainage and sewage and empting it on the appellant's land, causing it to cut a deep ditch or ditches in their land, is also an unlawful act of which appellants may justly complain. In 27 R. C. L., pp. 1151-1153, it is said: 'It is the generally recognized rule both of the civil and the common law that a landowner cannot collect surface water into an artitficial channel or volume, or precipitate it in greatly increased or unnautral quantities upon his neighbor, to the substantial injury of the latter. This is true although no more is collected than would have naturally flowed upon the property in a diffused condition, for it is evident that, while a given piece of land may receive a large amount of surface water without injury thereto when it gently flows thereon from natural causes, yet when collected and discharged in considerable volume at a given point, it may become very destructive and injurious,' * * *. The principle stated applies with greater force where, to the surface water collected, is added the drainage and sewage from a great number of houses." See also 56 Am. Jur., *Waters*, Sec. 71.

There are several unusual facts in this case which create some difficulty in the application of the law. If the County had brought the culvert under the Frederick Road and had increased substantially the collection of surface water from the 45-acre area and had canalized all of the water collected from both the north and south sides of the State highway into the large pipe and carried it thence in an impervious trough to the Hunters' land—and if it had done all of these things at substant-

ially the same time—we should have had a case which would fit more easily into the pattern of precedents, such as the *Neubauer* case. But we do not have that. Since 1926 the total drainage area has remained unchanged, the water from both sides of the main road has come down a watercourse substantially in the same location as that occupied by the large pipe and the cemeted trough. Neither the area drained, nor the course of the drainage has been altered. Apart from some possible increase in the amount of water due to the "inlets" said to have been built by the County and such increase as may be attributable to the paving of the rear of the County's lot and such as may be due to substituting a non-porous for a porous conduit, there is nothing which the County has done or for which it is liable, which would increase the volume of water. The testimony of two engineers, one employed by the County and the other by the Hunters, is to the effect that the substitution of the pipe for the open ditch has not materially increased the flow of surface water.

It is impossible for us to determine how much water may have found its way from the Fivak swimming pool or premises into the ditch. The testimony indicates considerable porosity of the pool. It is likewise impossible for us to determine—nor do we believe that the Chancellor was in a position to determine—with anything like exactness the extent to which the surfacing of the County's lot increased the flow. The area surfaced is not large by comparison with the whole drainage area; and though it has doubtless contributed to some increase in the flow, it is difficult to believe that it amounts to enough to have done any substantial damage.

Accepting the Chancellor's finding as to the various elements (including what may have been done by Fivak) which contributed to the increased flow, but eliminating those for which the County is not responsible, we think that neither the substitution of the pipe and the lining of the ditch or trough nor the paving of a part of the County's lot, nor both of these things together, make out such a case as calls for the granting of an injunction

as sought by the Hunters' cross-bill. Applying the "reasonableness of use" test recognized in *Whitman v. Forney,* 181 Md. 652, 31 A. 2d 630, we are of the opinion that the County should be permitted to continue to use the established drainage course through the Hunters' property to carry off surface water coming through the large pipe and that the decree of the lower court should be reversed insofar as it prohibits that use.

We also think it reasonable that the Hunters should be protected against the deposit of large quantities of filth and debris on their land and it seems highly probable that the pipe and cemented trough facilitate the transmission of such material. The granting which the Hunters installed was designed to permit the flow of water but to stop the influx of debris. Under the circumstances here prevailing, we think that the decree should be affirmed insofar as it dismisses the original bill brought by the County. However, in view of the likelihood of the continued discharge of debris, we think that in connection with the reversal of that part of the decree which granted injunction relief to the Hunters, the new decree should contain provisions requiring the County to keep the grating free of debris so that water may flow through it freely, and requiring that debris should be removed and disposed of by the County in such a way as not to create a nuisance. Compare *Bishop v. Richard,* 193 Md. 6, 65 A. 2d 334, where a similar problem was involved in keeping drainage ditches open.

One further matter deserves comment. There seems to be no sound reason why this storm water drain should deposit sewage material on the property of the lower landowners. The source of such material is not clearly established; but, from some of the testimony, it seems by no means impossible that it is due to defective sewerage facilities within the 45-acre area. Whether or not the source of such material can be established, we do not know, but certainly the overflow from septic tanks cannot be considered as surface water within the rule protecting the right of flowage of an upper landowner. We cannot tell from the record before us whether other

parties in interest should have been joined, if such an issue were to be raised and tried. This appears to be one phase of the case in which the County's position as a municipal corporation, and not merely as the owner of an upper tract of land, may be involved. Whether or not connections with the sanitary sewer should be required to be made throughout the area is a question not now before us. (See *Hitchins v. Frostburg*, 68 Md. 100, 11 A. 826, in which the right of a county to determine whether or not to install a sewer was recognized.) Our decision in this case is without prejudice to any claims or defenses which any party, including any party to these proceedings, might assert in the future in any contorversy involving this matter.

With regard to the matter of costs we affirm the decree of the Circuit Court as to the costs in that Court; and following what has been done in a number of other cases in recent years involving rights of flowage or drainage, we shall direct that the appellant and the appellees each pay their own costs in this Court.

> *Decree affirmed in part and reversed in part, and case remanded for further proceedings not inconsistent with this opinion. Decree as to costs in the trial court affirmed; the appellant and appellees each to pay their own costs in this court.*